## Panaud *vs.* Jones.

Where a last will and testament was executed, on the 19th day of Sept. 1846, by a Mexican citizen of California, before the judge (*Juez*) of the place, who certified at the foot of the will, that the testator was possessed of his entire judgment and understanding, and retained his perfect memory; *Held*, that it was incumbent on the person contesting the validity of the will to establish, that the testator was not of sound mind and disposing memory.

A verdict of a jury will not be disturbed on the ground that evidence was offered and received at the trial, after objection, that a custom had prevailed in California, amongst Spanish and Mexican residents, before the acquisition of the country by the Americans, that no more than two witnesses were requisite to attest the execution of a will, when it appears from such evidence that the custom had prevailed generally and for a long time.

The civil law, except so far as it has been expressly adopted by the legislative power, is without authority either in Spain or Mexico. *Per* Bennett, J.

By Spanish and Mexican law, wills are divided into solemn or sealed, and open or nuncupative. The former need not be written by, nor be subscribed by, the testator, but must be attested by the *escribano* of the place and seven witnesses, by subscribing their names on an envelope in which the will is enclosed, the testator saying to them, "This is my will; I desire you to write your names upon it;" such a will was, probably, never made in California; in the latter, the testator declares his will, either *viva voce*, or in a writing which he reads himself, or has the *escribano* read, if one is in attendance, or any one of the witnesses present, so that all the witnesses present may hear it. Such a will need not be signed by the testator.

Where an open will (*testamento abierto*) was admitted, on the face of the complaint, to have been "dictated" by the testator, and was reduced to writing, and signed by three subscribing witnesses, citizens (*vecinos*) of the place, one of whom was the Alcalde, and it was recorded in the proper book of the *Juzgado; Held*, that the will was valid, although the testator had not signed it, and although it was not made in the presence of an *escribano*.

By the civil law, an *escribano* may act in the double capacity of *escribano* and witness, in the execution of a will. *Per* Bennett, J.

Where authorities differ, the court ought to adopt that opinion which is most in unison with the former condition of things in California, and which will best conduce to uphold and carry into execution the intention of the parties. *Per* Bennett, J.

A will is valid, although one of the three subscribing witnesses was Alcalde of the place.

Where a testator had precisely ordained in what way his property was to be disposed of, and what duties the executors were to perform; *Held*, that the will was valid, notwithstanding one of the three subscribing witnesses was named in the will as one of the two executors, he not being named as heir or legatee, nor empowered to

HARVARD LAW LIBRARY

Panaud *v.* Jones.

institute an heir, nor vested with any discretion in respect to the disposition of the estate; and *held*, further, that such executor was competent as a witness to testify in support of the will.

The formalities of opening and publishing a *sealed* will considered. *Per* BENNETT, J.

A will in writing, having been acknowledged by the testator to be his last will and testament before the Alcalde, who possessed, in California, the powers and jurisdiction of an *ordinary* judge, (*juez ordinario*,) having been attested by the Alcalde and two witnesses, and there having been no *escribano* in the place, and the will having been registered by the Alcalde in his book of records; *Held*, that it was a public writing (*escritura publica*) as fully as it could have been made so in California, and required no further probating in order to authorize the executor to act under it; and *held*, also, that the omission to reduce it to the form of a *public writing* would not have affected its validity; and *held*, further, that it was not necessary in order to uphold acts of the executor, done in conformity with the provisions of the will, to show that he had taken out letters testamentary, the will itself being his authority and commission.

Alcaldes in California had all the powers and jurisdiction of judges of First Instance in districts where there were no judges of First Instance. *Mena* v. *Le Roy* (*ante, p.* 216,) affirmed.

The records of the place in which the testator lived and where his will was made, having been scattered or destroyed by a public enemy; it must be presumed, under the maxim *omnia præsumuntur rité et solenniter esse acta*, that the will was duly registered in the proper book of records. *Per* BENNETT, J.

An Alcalde appointed in a will as executor, but not named therein as heir or legatee, nor deriving any profit or advantage under it, and being allowed by law no compensation for his services, is competent to authenticate the will in his judicial capacity.

Where a full inventory of all the effects of the deceased is embodied in a will, it *seems* to be unnecessary for the executors to make out a new inventory; at all events, their neglect or omission to do so will not invalidate the will.

Where a testator, in his will, appointed two persons as executors, and gave to *each* of them *all the power over his property which he himself possessed as fully as in law may be required*, and empowered them to *sell it as to them should seem proper*, for the purpose of carrying into effect a provision in his will to pay his debts, and one of the executors, in good faith, and for a fair price, sold a portion of land for the purpose of raising money to pay the debts of the testator; *Held*, that the transfer, when attacked by the heirs of the testator, was valid, although not executed by the co-executor, when it appeared probable, from the testimony, that he advised and assented to the sale; and *held*, further, that a private sale was good, and that it need not have been at auction.

A part of the purchase money having been paid down, it *seems* that the heirs could not rescind the contract of sale, without first refunding the amount so paid. *Per* BENNETT, J.

By Mexican law, the wife, during the continuance of the marriage, has a revocable and *feigned* dominion in, and possession of, one half the property jointly acquired by her and her husband, (*gananciales;*) but the husband is the real and veritable

VOL. I.    32

owner, and has the irrevocable dominion in, all the *gananciales*, and may sell and dispose of them at pleasure.

After the death of the wife, the husband may dispose of the *gananciales*, without being obliged to reserve for the children of the marriage either the property in, or proceeds of, the *gananciales*.

If the heirs of a deceased wife be the children of the marriage, they have the right of succession, on the death of the father, to the whole estate, (*gananciales*,) with the right in the father to dispose of one fifth; but by the *estate* in law is understood the *residue*, after all debts have been paid.

A father, during his life time, and after the death of his wife, may, although there have been children of the marriage, dispose of the *gananciales* for any honest purpose, when there is no intention to defraud the children, and may, by last will and testament, direct the sale of them for the payment of his debts.

A. having married, and there being children of the marriage, and his wife having died, and there being common property acquired during the marriage, (*gananciales*,) *Held*, that the children, upon the death of the wife, did not acquire a *vested* estate in the common property, (*gananciales*.) and that the father had the absolute dominion in, and control over, and power to dispose of, such property during his life, and the power by last will and testament to direct the sale of the same for the payment of debts, not only such as were contracted during the continuance of the marriage, but also such as were contracted by the husband after the dissolution of the marriage by the death of his wife.

*J. M. Jones* and *A. C. Crittenden*, for the plaintiff.

*Horace Hawes*, for the defendant.

*By the Court*, BENNETT, J.   Clement Panaud was duly appointed by the court of First Instance of the district of San José, as *curator ad litem* for Isabella Alviso and Maria A. Alviso, infants under the age of twenty-one years, for the purpose of prosecuting this suit to recover certain real estate of the *succession* of their father and mother, Anastasio Alviso and Maria Antonia Altamarano.   Panaud accordingly filed his complaint, alleging that the said Isabella Alviso and Maria A. Alviso were the legal descendants and heirs of Anastasio Alviso and Maria A. his lawful wife, that said Anastasio died in the *Pueblo de San José* about the 20th day of September, 1846, his wife having died some years before.   The complaint sets forth that Anastasio Alviso, on the eve of his death, *dictated* a written instrument purporting to be his last will and testament, wherein he named Pedro Chevallo and Blas Alviso his testa-

Panaud *v.* Jones.

mentary executors, and directed them, if necessary, to sell the house and premises, to recover which this suit is brought, in order to pay certain debts. The premises were claimed to be a part of the *community* between Alviso and his wife. The will in question is as follows:—

" In the name of Almighty God, one in essence and three in " person, I, Anastasio Alviso, native of the jurisdiction of San " Francisco, and citizen of the *Pueblo* of San José, legitimate " son, and of legitimate matrimony, of Don Ignacio Alviso y " Doña Margarita Bernal, now deceased, natives of this depart- " ment, finding myself ill in bed of the sickness which God " our Lord has been pleased to visit upon me, but in my entire " judgment and memory, believing, as I firmly do, all the mys- " teries of our holy Catholic faith, in the belief whereof, and " faith in the divine mercy to pardon me all my sins and offen- " ses, through the intercession of the most holy Mary, our " Lady, whose patronage I implore, so that, with my guardian " angel, the saint of my name, and other saints of my devotion, " I may be favored and protected in the transit of my death, I " make, authorize, and ordain, this my testament, in form follow- " ing, to wit : I commend my soul to God, who created it from " nothing, and my body to the earth, from which it was formed.

" I declare that I am the widower of the deceased Maria An- " tonia Altamarano, by whom I had five children, two males " and three females, Blas, Ignacio, Isabel, Antonia and Ge- " ronima.

" I declare this is my will, that my body be interred in the " sacred place of Santa Clara, after having been laid out in the " habit or grave clothes which may be attainable, and that " there be such masses as may be possible, and the Señor " Padre's conscience may dictate. I say, that at the time of " my marriage with said Maria Antonia, she brought no dowry, " and neither she nor I had any capital, and that there was given " to her twelve reals of arras ; and that neither of the above " mentioned children has received any donation or portion of " any kind.

### " PASSIVE DEBTS.

" Item.—I declare that I owe Señora Pacheco, seven hides.

" Item.—I declare that I owe Señora Candelaria Patim, five " hides.

" Item.—I declare that I owe Antonio Chevallo, thirty-six " dollars.

" Item.—I declare that I owe old Captain John Burton, twen- " ty-two or twenty-three dollars.

" Item.—To the merchant ship of James Maguale I owe one " hundred dollars, and of this amount, forty dollars have been " paid in silver.

### " ACTIVE DEBTS.

" Item.—I declare that José Romero of this town owes me " for a lame horse.

" Item.—I declare that I have a yoke of oxen, two mares, " three colts, and one horse which Victor Romero is breaking, " one kitchen untensil lent to Vicente Manez, and the other kitch- " en utensils the Portuguese Manuel has, and they will be what- " ever he, in his conscience, may think proper to deliver over.

" Item.—I declare that I have a house, that in which Señor " Fernandez lives, and which he has hired at eight dollars a " month for the term of one year, which time being ended, " Señor Fernandez will pay up said rent ; then let the house be " sold to cover debts ; the remainder, including moveables and " property in the country, will be divided among my legitimate " children in equal portions.

" Item.—It is my will, that my said children remain under " the protection and guidance of my Señor Father Ignacio Al- " viso, whom I entreat by all my hereditary right, if he shall " deem me creditor, to make distribution thereof among my " aforesaid children.

" Item.—After all which is before expressed, has been fulfilled " with respect to my debts and credits, I institute as my sole " and universal heirs, the said Blas, Ignacio, Isabel, Maria An- " tonia, and Geronima, children of myself and the aforesaid " Maria Antonia, my wife, and the other legitimate descend-

Panaud *v.* Jones.

" ants which I may have at the time of my decease, and who
" ought to inherit, so that they take respectively according to
" their order, grade, and representation, and the disposition of
" the law, with the blessing of God and my own.

" Item.—I name as testamentary executors, (*albaceas*,) of this
" my will, Pedro Chevallo, and my son Blas Alviso, and to
" each one of them I give all my own power, as fully as in law
" may be required, in order that they may take possession of
" all my property and sell it, as to them may seem meet, and
" out of the proceeds thereof pay the dispositions of my will,
" within the legal term, or such future time as they may find
" necessary for which object it is hereby prolonged, and I give
" them power to delegate their offices, and substitute others in
" their stead, so that they, the said substitutes, may carry into
" due execution this my will, and they are to be considered as
" if herein named, and clothed with the same powers and facul-
" ties as those whose names are above expressed. And by
" these presents, I revoke and annul whatever testament or
" testaments, codicil or codicils, I may have made and author-
" ized, so that any such, which may make appearance or be
" shown, shall have no effect or validity, although they should
" have derogatory clauses and particular words, whereof espe-
" cial mention ought to be made; of which however I have no
" recollection.

" Thus I authorize it before the present judge of the place,
" on the nineteenth of September, in the year one thousand
" eight hundred and forty-six, being witnesses the residents Vi-
" cente Juanez, and José de Jesus Mesa.

" And I, the judge present, give faith that I know the testa-
" tor, who to appearance is of sound mind and perfect memory;
" in testimony of which I sign,

        (Signed)         " Pedro Chevallo.
" Witness. (signed)   José de Jesus Mesa.
" Witness. (signed)   Vicente Juanez."

" Recorded in the book of this Juzgado, at pages 274, 275,
" and 276.         (signed)         Fernandez."

HARVARD LAW LIBRARY

The complaint alleges that Pedro Chevallo, claiming to act under the will, took possession of the house and lot in controversy, and, by an instrument in writing, dated September 16, 1847, pretended to sell the same to the defendant. The complaint insists that the will, and all sales made by virtue thereof by Pedro Chevallo, are null and void, on various grounds :—

First. Because the minor children of Maria and Anastasio Alviso had a vested estate in the undivided one half of the house and premises in dispute by right of inheritance from their mother, and that their father had no power to dispose of the same by any title whatever. 2d. Because Anastasio Alviso, at the time he dictated his will, was not in a situation legally to bequeath his property. 3d. Because the will is not signed by the testator, nor is any reason given therein why he did not sign it. 4th. Because the will is not subscribed by the number of witnesses required by law, and because the residences and qualifications of the subscribing witnesses are not stated. 5th. Because Pedro Chevallo could not legally act as executor. 6th. Because the will was never probated, and because Pedro Chevallo was never recognized or confirmed as executor by any court of justice.

It is further alleged in the complaint that the sale from Pedro Chevallo to the defendant was void for the following reasons in particular: 1st. Because Pedro Chevallo had no right to sell without the consent of his co-executor Blas Alviso. 2d. Because he sold without the formalities required in the sale of the property of minors, and at a price below the real value of the property. 3d. Because the defendant has not complied with the conditions of the sale, nor paid the purchase money.

The complaint prays that the will of Anastasio Alviso and the sale from Pedro Chevallo to the defendant be declared null and void, and that the defendant be adjudged to deliver up the premises, and be condemned to pay four hundred dollars per month for the use and occupation of the house after the commencement of this suit.

The defendant insists in his answer, that the plaintiff, by his own allegation in the complaint, has shown title in the defend-

ant, by averring that the will in question was in fact dictated by Alviso, and was his last will, that he named Pedro Chevallo his executor with power to sell, and that Chevallo did sell the premises in question to the defendant. The defendant then insists on his part : 1st. That the sale by Chevallo was authorized by the only judge in the place, John Burton, Esq., then First Alcalde, who attests the instrument of sale. 2d. That the price paid was much above the value at that time. 3d. That the executor, by the custom and law of the country, as well as by the express requirements of the will, had a right to sell the property to pay the debts of the testator, and that the appropriation of the proceeds among the creditors or heirs, was not a matter for the vendee to look into, or be responsible for. 4th. That Alviso, when he made the will, was every way legally competent. 5th. That it was not necessary that the will should be signed by the testator—that, if he declared it to be his will, it was enough. 6th. That each executor was clothed with the testator's full power to sell. 7th. That the will had been executed in the presence of, and authorized by, the judge of the place, and was, in addition, admitted and recognized by the plaintiff himself. 8th. That every essential formality in the will had been complied with. 9th. That the defendant paid a part of the purchase money on the sale of the premises, and offered to pay the rest as it became due, but that the executor refused to receive it, and that the defendant stands ready now and offers to pay it.

On the filing of the answer the plaintiff put in a supplemental complaint, wherein he insisted that the defendant had no title, for the following reasons in addition to those relied upon in his original complaint : 1st. That if Chevallo ever had any power as testamentary executor, such power ceased at the expiration of one year from the date of his nomination, and that the sale to the defendant was made more than one year after such nomination. 2d. That no sale of an estate is valid unless it be made at public auction. 3d. That no inventory was taken of the estate of either the mother or father of the minors, and that no partition had been made of the property

inherited by the minors from their mother, and the property owned by their father.  4th. That Chevallo should have been confirmed as executor by the judge, on presentation of the will, within one month.  5th. That the sale ought to be rescinded for *lesion*, on the ground that the price agreed to be paid was not equal to one-half the value of the property.

The cause was tried before a jury.  The plaintiff established the due appointment of himself as *curator ad litem* for the minor children of Anastasio Alviso.  He also proved that they were the children of said Anastasio and his wife Maria Antonia Altamarano, the decease of Anastasio at the time alleged in the complaint, and the death of his wife several years before him.

On the part of the defendant, the will of Alviso was given in evidence, and was proved to have been subscribed by Pedro Chevallo, Vicente Juanez, and José de Jesus Mesa, as attesting witnesses.  The will was not signed by the testator. It was proved, that Pedro Chevallo was acting Alcalde of the jurisdiction of San José during the year 1846, at the time of the death of Alviso, and that the property in question had been offered, but a short time before the sale to the defendant, at one-half the price which the defendant agreed to pay for it.

Evidence was given, after objection by the plaintiff, to show that, according to invariable custom, two witnesses were sufficient to attest any instrument, in order to give it validity, and natives and old settlers of the country testified that only two witnesses were required to sign a will to make it valid.

It further appeared from the testimony that Alcaldes were judges of their respective districts.

The transfer from Chevallo to Jones was made in court, and part of the purchase money, amounting to $200, there paid.

It appears that Alviso did not know how to write.

The defendant had offered to pay to Chevallo the balance of the purchase money, but Chevallo refused to receive it, on the ground that the time for payment had passed.

It appeared also that Chevallo had distributed some of the

Panaud *v.* Jones.

money which he received from Jones among the heirs and children of Alviso.

Before the commencement of this suit, the validity of the will had been contested between the defendant and Panaud before the judge of First Instance of San José, and the court, after hearing the proofs and allegations in the matter, decreed that the will was good and sustained its validity, and filed it among the records of the office. At what time this proceeding took place does not appear.

At the trial the defendant paid into court the balance of the purchase money due.

The counsel for the plaintiff asked the court to instruct the jury upon seventeen propositions. The court declined to give any specific instructions, but told the jury that they had heard the law and evidence, and were fully competent to decide the matter. The instructions asked involve the principles of law which will hereafter be considered.

Certain testimony was offered by the defendant and received by the court, after objection by the plaintiff, which, though it might not have been strictly competent evidence, could have had no material effect on the result of the suit. It will not be necessary, therefore, to consider it here, inasmuch as I think it clearly established that the minors were, in law, the legitimate children of Anastasio Alviso and Maria Antonia Altamarano.

The whole case appears to me to depend upon the conclusions arrived at on two points of inquiry: 1st. Was the will of Alviso valid in all respects; and 2d. Conceding the will of Alviso to be valid, could Chevallo, one of the executors, convey any title, without the joint co-operation of his co-executor Blas Alviso?

If either of these questions be determined in the negative, the plaintiff is entitled to recover; and both must be decided in the affirmative in order to support the verdict.

The first question, then, to be considered is, whether the will of Alviso was executed with the solemnities and formalities

required by law, and whether, at the time of making it, he was of sound mind and disposing memory.

An answer is very readily given to the last branch of this inquiry. At the conclusion of the will, the *judge*, who attests it, certifies that, to all appearance, the testator was possessed of his entire judgment and understanding, and retained his perfect memory. There is nothing shown to the contrary. But, without any such certificate, it could not be assumed that the testator was mentally incompetent to make a valid will. On the contrary, the reverse must be presumed. If the plaintiff intended to attack the will on that ground, he should have proved that the testator was *not* of sound mind and disposing memory. On reading the whole testimony in the cause, I cannot discover any proof which has a tendency to establish that point. So far then as this objection is concerned, I shall assume that the testator was competent to dictate the instrument in question.

The next question is, whether evidence was admissible to prove that it was the custom to require only two attesting witnesses to a will. It was a maxim of the Roman law, *communis error facit jus ;* and this maxim has been adopted in the Spanish law to its full extent. I do not understand that a custom, in order to be asserted, must have prevailed for twenty years and be conformable to law. On the contrary, ten years are sufficient to establish it; and, having prevailed for that length of time, and possessing the other necessary qualities, it acquires the force to abrogate the previously existing law.

" Custom," says Escriche, " is the practice long used and re-
" ceived, which has acquired the force of law. In order that
" custom may be *legitimate* and not corrupt, (*corruptela*,) it is
" necessary that it should have been introduced with the *tacit*
" consent of the legislator—that it be conformable to the ge-
" neral welfare, and that it should have been observed for the
" space of ten years. *Legitimate* custom acquires the force of
" law, *not only when there is no law to the contrary*, but, also,
" when its effect is to abrogate any former law which may be
" opposed to it, as well as to explain that which is doubtful.
" Hence it is said that there may be a custom without law,

Panaud *v.* Jones.

"in opposition to law, and according to law." (*Escriche's Derecho Español*, 23, 24. *See also to the same effect*, 1 *Feb. Mej.* 55, 56, *sec.* 2 ; 1 *Sala Mej.* 248 *to* 253 ; *Ley* 6, *Tit.* 2, *Part* 1 ; 1 *Pan. Mej. page* 614, 615, *No.* 1418.) And it is one of the maxims of the Spanish, equally with the Roman law, that custom is the best interpreter of the law. (4 *Sala Mej.* 624, *Regla*, 28 ; 3 *Pan. Mej.* 629 ; *Regla*, 29.)

This rule is in accordance with several decisions in the United States. (*Davey* v. *Turner*, 1 *Dallas*, 13; *Lloyd* v. *Taylor*, *id.* 17.) In both these cases it was ruled, that an acknowledgment of a deed by a *feme covert* before a justice of the peace, was sufficient, under a long usage, to make her deed valid, though not strictly in conformity with law. In *Lloyd* v. *Taylor*, it appearing in evidence that it had been the constant usage of the province for *femes covert* to convey their estates in this manner without an acknowledgment or separate examination, and that there was a great number of valuable estates held under such titles, which it would be dangerous to impeach, the court gave a charge to the jury in favor of the defendants, founded on the maxim, *communis error facit jus*, and the jury, accordingly, found for the defendants. The same point was ruled in *McFerran* v. *Powers*, (1 *Serg. & R.* 102.) In this case the acknowledgment was before a justice of the supreme court; and it appeared that it had been the constant practice for the judges of the supreme court to take acknowledgments under an act, by virtue of which, it was claimed, they had no authority. But the court say, " Be that as it may, so extensive and deep-rooted " is the practice, that numerous titles depend on it, and it would " be unpardonable to disturb it now by a critical examination of " the words of the act." (*Per Tilghman, Ch. J., p.* 106.) The same principle was adjudged in *M'Keen* v. *Delancey's Lessee by the supreme court of the United States.* (5 *Cranch*, 22.) The question in this case arose upon the construction of the same act which the court was called upon to interpret in *McFerran* v. *Powers;* and Ch. J. Marshall, delivering the unanimous opinion of the court, says, " were this act of 1715 now, for the first " time, to be construed, the opinion of this court would cer-

" tainly be, that the deed was not regularly proved."   And in a subsequent passage he remarks, that " in construing the sta-" tutes of a state on which land titles depend, infinite mischief " would ensue, should this court observe a different rule from " that which has been long established in the state."   And it will be observed that in the case of *M'Keen* v. *Delancey's Lessee*, so anxious were the court not to overturn an established usage, that they upheld the custom upon the declarations of members of the bar and the certificate of the circuit judge, although it does not appear that any evidence was given, at the trial of the cause, to prove the custom.

From an examination, both of Spanish and American authorities, I am led to the conclusion that the evidence offered to prove a custom in this state, that no more than two witnesses were necessary to the validity of a will, was properly received by the court and submitted to the jury.   The evidence was by no means conclusive, but was fit for the consideration of the jury, and the objection to its admissibility was properly overruled by the court.   The custom with respect to the execution of wills, so far as the testimony goes, appears to have prevailed generally and for a long time in California; it may have been the universal practice from the first settlement of the country; and I do not feel called upon to overturn all titles in this state which may depend upon similar wills, because the edicts of Justinian, or the laws of Toro, had not been known and strictly followed by the simple and uneducated Californians.   But whether such *was* the custom or not, it was the province of the jury to decide; and they have said, so far as their opinion can be gathered from their verdict, that it was.   I have noticed this objection thus at length, not because I deemed that the merits of the case depended upon this custom, but because, if improper evidence had been admitted, which could probably have had an influence upon the verdict of the jury, I should have felt bound to remand the cause for a new trial.

But I am of the opinion that the will of Alviso was a valid will, when tested by the strict rules of the Mexican or Spanish law.   I speak of Mexican and Spanish law, and not of the laws

Panaud *v.* Jones.

of Justinian, nor of the doctrines of commentators, ancient or modern, on the civil code of Rome; for that code, save so far as it has been expressly adopted by the legislative power, is without authority in Spanish countries. The jealousy manifested towards the introduction of the civil law into Spain in the early ages of the Spanish monarchy, was so great, that even the reading of it was prohibited under the most severe penalties. (*Ley 8, Tit. 1, Lib. 2, of Fuero Juzgo, as cited in Feb. Mej. vol. 1, p. 52.*) And a modern author of high authority uses the following language:—" The civil laws are not, and should not be, deno- " minated laws in Spain, but opinions of the wise to be followed " only where the laws are deficient, and where they are not in- " consistent with the law of nature or the laws of the country ; " which latter, and not the Roman law, are properly speaking the " common law ; and neither the Roman law, nor any other foreign " law, ought to be used or observed, as the *Fuero Juzgo* ex- " pressly declares." (*Feb. Mej. ubi supra.*)

I will, then, inquire what sort of a testament, according to Spanish law, this is which is now under consideration. Adopting the definition, which is to be found in the most modern works upon the subject, it will properly be denominated an open or nuncupative will. The *Sala Mejicano*, published in the city of Mexico in the year 1845, (*vol. 2, p.* 110, *sec.* 12,) gives the following definition :—" Testaments are first divided into solemn, " and unsolemn or privileged. A solemn testament is that " which is made in conformity with the common law, (*al derecho* " *comun.*) Privileged is that in which, by virtue of the favor " conceded to a particular class to which the testator belongs, " some of the solemnities are omitted, which the common law " demands." And again he says on the same page, (*sec.* 13,) that testaments are divided into open or nuncupative, and sealed or written.

The sealed testament is, where the testator, having written his will, or caused it to be written privately, presents the roll or package sealed up, and requests the attestation of the *escribano* and witnesses, in order that what is therein written may be substantiated as his will. In such case it is required that all the

witnesses sign with the testator upon the envelope, and that the *escribano* put his hand and seal. In *Febrero Mejicano*, (*vol.* 2, *p.* 7, *sec.* 10,) it is said, " A sealed or written testament is that " in which a testator presents a paper sealed up (*cerrado*) with " wax, wafer, or any similar substance, declaring that therein is " contained his last will. It is indispensable that this declara- " tion should be made before an *escribano*, and seven witnesses " of the required qualifications, under penalty of the will's be- " ing declared a nullity. It is of no consequence whether such " a testament be written by the testator, or by another in his " name, or whether it be on sealed or unsealed paper. That " which is indispensable is, that the testator deliver it to the *es-* " *cribano*, in order that he write his attestation upon the enve- " lope, and that the testator, in the presence of the *escribano*, " sign it with all the witnesses, saying to them, This is my tes- " tament; I request that you write your names upon it."

The indispensable necessity of this formality in the authen- tication of a sealed testament, which has been made in private, and the knowledge of which is confined to the breast of the testator, is readily perceived. The contents of the testament have never been seen, and are unknown to all the world. The instrument enclosed in the envelope, is not attested by any wit- nesses, and perhaps not even signed by the testator. It is not to be opened and published until after his death, and then only in presence of the ordinary judge, the *escribano*, the witnesses, and the parties interested. It is presumed that this mode of solemnizing a last will and testament is resorted to only where the testator is desirous of concealing his intentions respecting the disposition of his estate, and is unwilling to trust the secret to any one. Such a will is, probably, but rarely made, and it is doubted whether an instance of a sealed will can be shown to have occurred in California, since the period of its first settle- ment.

But if the testament be not sealed, whether it be written or dictated *viva voce*, if it be open so that its contents may be known in the testator's lifetime,—in short, if it be no secret,— it is obvious that there would not be the same danger of forgery

Panaud *v*. Jones.

and imposition, and that the law would not wisely require the same formalities and strictness of proof in respect to it, as in the case of a sealed testament.

Hence we find that the law has recognized another species of testament, called open, nuncupative, or not sealed. " It is " that," says Febrero, " in which the testator publishes his will, " either *viva voce*, or by means of a writing which he reads " himself, or has the *escribano* read, if one is assisting, or any one " of the witnesses, so that those present may hear it." (2 *Feb. Mej*. 5, *sec*. 4.)

It is true that a certain number of witnesses should be present, when a testament in this form is made, in order that it may be duly substantiated after the testator's decease: but the testament need not be signed either by the testator or witnesses, for it is not indispensable that it should be written, although in practice it usually is. (*Aiora de Partitionibus, Pars*. 3 *Quæs*. 23, *sec*. 70, *ad fin*.) *Law* 1, *tit*. 19, of the *Ordamiento de Alcalá* does not require it to be written. (2 *Pan. Mej. page* 604, *No*. 3290.) Nor does *Law* 3, of Toro, in which the former is adopted and incorporated, and I am not aware of any commentator who holds it to be necessary.

Now, it is admitted of record on the face of the complaint that the will in question was " dictated" by Alviso, that it was in truth his last will, that he therein named Pedro Chevallo his executor, and gave to him the power to sell the premises in question. All this the plaintiff admits, and produces the written evidence, the will itself, upon which appear the names of three subscribing witnesses, who are described in the body of it as citizens of the place, and one of whom is proved to have been the Alcalde. It appears, moreover, by an indorsement upon the same document that a record had been made of it in the proper book of the Juzgado. The plaintiff then, after this, alleges that the will is void because it is not signed by the testator and a certain number of witnesses. But we have above seen that it need not even be in writing or signed by anybody. The law only requires that a certain number of witnesses should be present, in order that proof may exist of the last dispositions

of the testator. Here, however, the dispositions of this instrument are admitted by the complaint to have been dictated by Alviso, and it should seem that no further proof could be demanded. It is not claimed that more than three witnesses are necessary to an open or nuncupative will; it appears that three witnesses were present at the making of this will, and if the requisite number were present, it is sufficient that they saw the testator and heard his words. (*Escriche, Dic. de Leg. Art.* "*Testamento Abierto;*" 2 *Sala Mej.* 118, *sec.* 22.)

The original document which was produced in court, has affixed to it the names of Vincente Juanez and José de Jesus Mesa, who are described as citizens, (*vecinos,*) and of Pedro Chevallo, who is described therein, and is proved to have been Alcalde of the place, and of course a citizen. No *escribano* was present, for such an officer was probably never known in California. Nor does the law require the presence of an *escribano.* The law of Alcalá and of Toro, already cited, makes it necessary that three witnesses should be present when an open will is made, and that they should be citizens of the place, (*vecinos.*) Febrero says that this kind of testament may be made before an *escribano* or without one, and that, i. five witnesses, (not an *escribano,*) cannot be had, it will be sufficient if three witnesses are present. (2 *Feb. Mej.* 5, *sec.* 5.) To the same effect is the *Sala Mejicano,* (2 *Sala Mej.* 111, *sec.* 13.)

That three witnesses will suffice, all authors seem to agree. Coverubias is of the opinion that, with an *escribano,* two witnesses would suffice. Escriche agrees with him; Sala dissents, but admits that three citizens, without an *escribano,* would be sufficient. Even this number, according to Antonio Gomez, the most eminent commentator on the laws of Toro, may sometimes be dispensed with. He gives it as his opinion, that if one be among enemies or infidels, either as a merchant, an ambassador, or in any other capacity, he may make his testament in conformity with the divine law, or the law of nations, which, he understands, requires the presence of two witnesses. This is the least number, which, according to the Civilians, could make

complete proof in any case.   But whatever be the number of witnesses requisite to the validity of an open will, the sole object sought to be attained is the proof of what the testator ordained.  *In testamentis et ultamis voluntatibus tractatur de probando voluntate defuncti post ejus mortem.*  (*Anton. Gomez, Com. in ley* 3, *Tauri.*)

It appears then that the requisite number of witnesses were present when Alviso made his will, for three have signed and attested the document.   This part of the subject may therefore be dismissed.

The next question which presents itself is, whether these witnesses had the proper qualifications to enable them to become attesting witnesses ?  Whether an *escribano* may, at the same time, act in the double capacity of *escribano* and witness, is a disputed point in Spanish law, Coverubias holding the affirmative, (*Coverubias Opera, Tom.* 1, *page* 58, *cap.* 10, *sec.* 2 *and* 3 ;) and Sala, the negative.  (2 *Sala Mej.* 111, *sec.* 13.)  I see nothing inconsistent in his signing as a witness, and where there is a diversity of opinion among writers of approved authority, we ought to adopt that opinion which is most in unison with the former condition of things in this country, and which will probably conduce the best to uphold and carry into execution the intentions of parties.   There was then, I think, nothing in the fact of Pedro Chevallo's being Alcalde, which disqualified him from being a witness.   Was he rendered incompetent by reason of his being named as executor.   It will be observed that Chevallo is not named as heir or legatee, nor is he empowered by the will to institute an heir, or vested with any discretion in respect to the disposition of the estate, but the testator has precisely ordained in what way his property was to be disposed of, and what duties the executors had to perform.   In such case the executor named in the will is not disqualified from being a witness.

Febrero in treating of the qualifications of witnesses, says, legatees may be witnesses to the testaments in which the bequests are made, and also trustees and testamentary executors, whenever the will is made in the form of *escritura publica.*  If

the will is not made in this form, and they are called as witnesses to prove it, they may likewise be received as such, providing there be no matter in dispute respecting the inheritance. But, if they be named to make distribution of the property of the deceased, and stand in the place of heirs, they cannot be witnesses to the testament in which they are named, by reason of the rule that the heir is incompetent to be a witness. (2 *Feb. Mej.* page 6, *sec.* 8.)

This doctrine laid down by Febrero coincides with numerous decisions based upon the principles of the common law both in England and the United States. In *Goodtitle* v. *Welford*, (*Douglass' Rep.* 139,) it was held, that an executor, who takes no beneficial interest under a will, is a competent witness to prove the sanity of the testator. So in *Lowe* v. *Joliffe*, (1 *W. Blackstone*, 365,) an executor in trust, who had taken a legacy of two hundred pounds under the will, but who had released his interest in the legacy, was held to be a competent witness to establish the validity of the will. There have been numerous decisions in the United States to the same effect. Thus in *Hawley* v. *Brown*, (1 *Root*, 494,) the wife was held to be a competent witness to a will, she having no interest but a trust in the estate. In *McLean* v. *Barnard*, (*id.* 462,) and in *ex parte Ford*, (2 *id.* 232,) it was ruled that the judge of probate was a good witness to a will. In *Dunn ex dem. Snedeker* v. *Allen*, (*Penning.* 43,) an executor was held to be a competent witness to a will, unless he take an interest under it. From the above authorities I have come to the conclusion that Pedro Chevallo, who was named an executor in the will, but who took no interest under it, was competent to sign as a subscribing witness, and competent to testify in support of the validity of the will.

Another objection urged against the validity of the will is, that it was never probated, and that Pedro Chevallo was never recognized or confirmed as executor by a court of justice. But can an omission or neglect of duty on the part of an executor named in a will duly made, whether sealed or open, be sufficient cause, either for the revocation of the will, or for declaring it

HARVARD LAW LIBRARY

Panaud *v*. Jones.

inoperative ? It is apprehended that no authority can be adduced, showing that the intentions of the testator may be thus thwarted after his death, by negligence not his own. Whatever might be the neglect of duty on the part of an executor, or of any other person, with respect to a will in his hands, the law would naturally provide for carrying its provisions into effect when it came to light—imposing upon the delinquent penalties for his neglect of duty, rather than inflicting punishment upon innocent parties by annulling the last will and testament of the deceased. With respect to a sealed will it is easy to perceive that the proving or probating of it, must indispensably precede any act under it ; because until it is proved, it cannot be opened, nor can it be known who is executor or who is heir, nor what dispositions are made therein ; and when once the seal is broken, and the will opened, the evidence of its authenticity is gone forever. The law, therefore, has prescribed, very minutely, the formalities to be observed in the opening and publication of sealed wills ; not for the purpose of giving them any additional *validity*, but in order that the document, which the world has not yet seen, may be ascertained, in truth, to contain the last dispositions of the deceased. For the purpose of protecting legitimate heirs against a spurious offspring, and of enforcing the dispositions of the testator, there is required the presence of the ordinary judge, the *escribano*, and the witnesses, who heard the declarations of the testator when alive, to witness the breaking of the seals and the publication of the will.

Accordingly, he who has such a testament in his power, is required to present it to the judge of the place within one month from the time of the testator's death ; and, in default of doing so, he forfeits, for the benefit of the soul of the deceased, whatever bequest may have been made in his favor, or, if nothing be left him in the will, he may be required to pay all damages and a fine in addition. (2 *Sala Mej.* 126, *sec.* 34 ; 2 *Feb. Mej.* 232, *sec.* 1.)

When the sealed package has been presented to the judge, he causes the witnesses and *escribano* who have subscribed their names upon the cover to be cited, and upon their recognizing

their signatures, proving the testator's identity and his decease, the sealed package, upon inspection, being found unbroken, and in no wise defaced or otherwise suspicious in its appearance, the judge causes it to be opened, read and published, in the presence of the *escribano* and witnesses, and to be registered in the proper book, and a record to be made of all the solemnities observed in its publication. Of this record copies are given to such of the interested parties as may demand them. (2 *Sala Mej.* 126, *sec.* 35 ; 2 *Feb. Mej.* 232 *to* 235, *secs.* 2, 3, 4, 5, 6, 7 ; 1 *Perez' Compendio,* 227, 228.)

It would seem that the observance of these formalities with respect to an open or nuncupative will, would be useless ceremony. The will has been made openly and published by the testator during his lifetime, and there need be no further publication after his death. If it were made before an *escribano,* or, in defect of one, before a judge whose acts impart absolute verity, it is already probated ; and, in the Californias, Alcaldes had all the powers and jurisdiction of judges of First Instance. (*Decree of March* 2, 1843, 2 *vol. of Decrees of Provisional Government ; Mena* v. *Le Roy, ante, p.* 216.) The will of Alviso was made before an Alcalde. But even though it were not made before any officer, yet being reduced to writing, and attested by the requisite number of witnesses, it might have been proved at any time, and the omission to reduce it to the form of a public writing (*escritura publica*) would not affect its validity ; for, this may be done and the will be registered for the security of all persons, upon the petition of any party interested. (2 *Sala Mej.* 127, *sec.* 37.)

After a careful examination of the books upon Mexican law, I can find no authority which requires an executor, either in the case of a sealed will or an open will, to take out letters testamentary before he is empowered to act. I find no such doctrine in Febrero, or Sala, or Perez. The authority of the executor is derived from the testator alone, and the will is his commission. He ought regularly to present himself before the judge of the place and be sworn to execute his trust with fidelity, but he is not even required to give any security for the proper discharge

of his duties, so long as he remains free from suspicion. (2 *Feb. Mej.* 158.)

The will of Alviso having thus been acknowledged by him to be his last will and testament, before the Alcalde, who was the ordinary judge, and attested by two witnesses in addition to the Alcalde, who, we have seen, was also a competent witness, and there being no *escribano* in the place, and the will appearing from an indorsement thereon to have been registered in the book of records of the Alcalde, it was, we think, a public writing, (*escritura publica*,) as fully as any document could possess that quality that has ever been executed in the country, and consequently required no further proof.

I have said that the will appeared by an indorsement thereon, to have been registered. Even had not this been done, I should not consider it our duty to declare the will void on account of this omission. And, further, without any proof of registry, I should, under the peculiar circumstances, feel bound to apply the maxim, *omnia præsumuntur rité et solenniter esse acta*, a maxim equally applicable in the civil and common law. It is matter of history, that the records of the Alcalde's office at San José have been mostly scattered or destroyed, and that, at the time of Alviso's death, a public enemy of his country was in possession of the pueblo, and his banner floating over the very house in which the archives were deposited. I think, in such case, it would not be carrying the doctrine of presumption too far, to assume, without proof, that the will of Alviso was duly registered. (1 *Greenleaf, Ev. sec.* 20 ; *Cowen & Hill's Notes*, 297.)

A question was made on the argument whether Chevallo, the person named as executor, was competent to authenticate the will in his judicial capacity. It has already been seen that, if he were a private citizen, he would be a competent witness. It is equally undoubted in the opinions of Mexican jurists, that a testamentary executor, who derives no benefit under the will, is competent to authenticate it as judge, or in any other capacity. The reason is, that the charge accepted by him is gratuitous, and unaccompanied by any advantage to himself, for the law

allows him no compensation. The judges of the supreme court of Mexico, and the judges of the superior tribunals, are prohibited from taking upon themselves the charge of testamentary executors, but the inferior judges are not. (2 *Feb. Mej.* 156, *sec.* 2.) Febrero, in treating of the persons who may be executors, says, in the section last cited from his work :—" Likewise " the *escribano* who authenticates the testament may be execu- " tor, because, besides that he is not prohibited, he thereby " derives only labor and responsibility in fulfilling the will of " the testator, and the obligation to give a strict account of his " trust," &c. But if he derives any benefit under the will, he cannot be executor. It appears, therefore, that the person named in the will as executor, is competent to attest or authenticate it in any form, unless he is also named as heir or legatee, or is in some way to derive profit or advantage under it, which would not belong to him in case of intestacy. The law regards the office of such an executor simply as a friendly and gratuitous office.

Whether it was the duty of Alviso's executors to make a new inventory of his effects, when a perfect inventory appears to be embodied in his will, it is unnecessary to inquire. (*See Aiora de Partitionibus, Pars* 1, *Cap.* 2, *No.* 17.) The material question is, not whether the executors faithfully and punctually performed all the duties required of them, but whether their neglect or omission of duty invalidates the will. I think not.

I have thus examined the various objections made by the plaintiff's counsel upon which he claimed that the will of Alviso was inoperative and void, and have come to the conclusion, that it was made in due form, before the proper authority, was attested by a sufficient number of competent witnesses, and remains unaffected by any omission or neglect of the executors, occurring subsequent to the death of the testator.

The remaining point for examination is, whether Chevallo, the executor, had power to sell and did sell, in legal manner, the premises in dispute to the defendant. And this presents two questions for consideration : First, Whether Chevallo, who was one of two executors named in the will, had power to sell without joining with his co-executor ; and Second, Whether,

Panaud v. Jones.

admitting his sole authority, Alviso could direct by his will, that the premises in question should be sold for the payment of his debts.

The first question is whether Chevallo alone, had the power to make a valid transfer of the property. It may be conceded that, in ordinary cases where two executors are named in a will, both must join in the execution of the powers conferred therein. But, it must also be conceded, that the testator may make dispositions in his will to vary this legal rule. The intention of the testator to be gathered from the instrument itself, is the guide. When that is ascertained, it becomes the law of the case. This is the rule of the common law. It is more especially the rule of the civil law, and of the Spanish and Mexican law. " *Voluntas testatoris pro lege habetur,*" says the Pandects. (*L.* 35, *sec.* 3, *de Hæredib. instituend.*) " *La volun-* " *tad del testador tiene fuerza de ley,*" says one of the maxims of Spanish and Mexican jurisprudence. (3 *Pan. Mej.* 346, *Reg.* 384.) The executor is understood to accept the charge, not for gain, but as the last friendly office which he can perform for the deceased, and he looks to the dispositions contained in the will as the rule by which his conduct will be judged.

In the case before us, the testator gives to *each* one of his executors *all the power over his property which he himself possessed as fully as in law may be required*, in order that they take possession thereof, and *sell it as to them may seem meet*, so that with the proceeds they may fullfil the dispositions of his will within the legal term, or within such longer term as they may find necessary, and for that purpose he prolongs the term prescribed by law. The testator thus conferred all the power which he himself had over his property, not to his executors jointly, but to each one of them, and consequently each one was authorized to dispose of the property for the purposes mentioned in the will. " When several executors " are named," says Sala, (2 *Sala Mej.* 224, *sec.* 4,) " they will " administer upon the estate at the time and in the manner pre- " scribed by the testator, whether jointly, or in succession, or " so that the person first named shall have the administration,

"which is understood to be commanded, when the testator "shall name each one of them *in solidum.*" That is, when the testator confers upon each one of several executors, as in this case, full power to administer, he who first enters upon the administration, shall proceed in it to its conclusion, without being obliged to advise with the others, and without their having a right to intermeddle in any respect. (2 *Feb. Mej.* 160, *sec.* 8.) In this case, Chevallo first commenced the administration : by the law above cited, the other had no right to interfere in it. It does not appear that he ever did ; on the contrary, it is rendered at least probable by the testimony, that he advised and assented to the sale by Chevallo to the defendant. I think Chevallo alone had power to sell, without joining with his coexecutor.

The view above presented affords also an answer to the objection, that the sale was a private sale, and not at auction. The testator gave to Chevallo as full power to sell as he himself possessed, and the general rule of the Spanish law that sales by executors must be at auction, does not apply. In point of fact, as appears from the record, the premises were sold at a price which was proved to have been above their value at that time. The deed of sale was authorized by the judge of the place, who signs it as such, and records it in the book of records of the *juzgado.* One-third of the purchase money was paid at the time ; the balance was tendered and refused before the first instalment became due, and was brought into court, and was placed, and still remains, on deposit for the use of the estate. The least the plaintiff could have done, if he wished to rescind the sale, would have been to offer to repay the money which the heirs whom he represents had received from the defendant.

I proceed now to the last point which I propose to examine ; and that is, whether Alviso had the power to direct the disposition of the property in the manner specified in the will.

Alviso died a widower in 1846, his wife having died some years before ; and it is alleged that, on her decease, one undivided half of the common property became vested in her children by in-

heritance, and that Alviso had no right to dispose of it in any manner. The law respecting the property of husband and wife in California has undergone but little alteration in consequence of the passage of the act of 17th April, 1850, defining the rights of husband and wife. Section 1, of that act declares that " all property, both real and personal, of the wife owned " by her before marriage, and that acquired afterwards by gift, " bequest, devise, or descent, shall be her separate property ; " and all property, both real and personal, owned by the hus- " band before marriage, and that acquired by him afterwards, " by gift, bequest, devise, or descent, shall be his separate pro- " perty." It is further provided in the same act as follows : " Section 2. All property acquired after the marriage by either " husband or wife, except such as may be acquired by gift, be- " quest, devise, or descent, shall be common property. Sec- " tion 6. The husband shall have the management and control " of the separate property of the wife, during the continuance " of the marriage," &c. " Section 9. The husband shall have " the entire management and control of the common property, " with the like absolute power of disposition as of his own se- " parate estate. The rents and profits of the separate property " of either husband or wife shall be deemed common property. " Section 10. No estate shall be allowed to the husband as " tenant by courtesy upon the decease of his wife, nor any es- " tate or dower be allowed to the wife upon the decease of her " husband." So far we understand the statute of California to be a correct exposition of the Spanish law respecting the pro- perty of husband and wife. But in section 11, we apprehend there is a wide departure from it. That section is as follows : " Upon the dissolution of the community by the death of either " husband or wife, one-half of the common property shall go " to the survivor, and the other half to the descendants of the " deceased husband or wife, subject to the payment of the " debts of the deceased. If there be no descendants of the " deceased husband or wife, the whole shall go to the survivor, " subject to such payment." Now this is manifestly a deviation from the principles of the civil and the Spanish law, unless the

words " debts of the deceased," in this section, shall be construed as including all debts of the community contracted for the common benefit, whether by the deceased or by the survivor. If this construction may be put upon it, then it is consistent with the civil and Spanish law, and what is more, is consistent with reason and justice. I have referred to this statute somewhat at length, not because it controls this case, but for the reason that, with the exception above stated, it contains a clear and succinct statement of the Spanish law respecting the property of husband and wife.

According to *Ley* 1, *tit.* 3, *lib.* 3, *of Fuero Real*, which is *Ley* 1, *tit.* 4, *lib.* 10 *of the Novissima Recopilacion*, the property acquired by husband and wife, or by either of them, during the marriage, whether by purchase or contract, or through their labor and industry, as well as the fruits, profits, and increase arising from their separate estates, which belonged to each before marriage, is held by them in common and denominated *Gananciales.* But (*id. Ley* 2) that which comes to either by inheritance, or gift, or by royal grant to the husband for military service, is the separate property of the party thus acquiring it. And in the conjugal society, which differs in some important particulars from the conventional, it makes no difference, with respect to the right of equality in the participation of gains, how much, either of capital or labor, each party may have contributed towards their production. (1 *Feb. Mej.* 219, *sec.* 4.)

By *Ley* 1, *tit.* 12, *part* 4, which is the same as *Ley* 5, *tit.* 4, *lib.* 10 *of the Novissima Recopilacion, & No.* 2774 *of the Pandectas Mejicanas, vol.* 2, *page* 447, it is provided that the husband, during the continuance of the marriage, may freely alienate and dispose of the common property, with the exception of that which belongs to the class of *castrenses* or *quasi castrenses*, without the consent of the wife, and such alienation shall be valid, unless it be proved that it was made with intention to defraud her.

*Ley* 14 *of Toro*, the same as *Ley* 6, *tit.* 4, *lib.* 10 *of the Novissima Recopilacion, and No.* 2775 *of the Pandectas Mejicanas, vol.* 2, *page* 448, declares that, the marriage being

Panaud v. Jones.

dissolved by the death of either husband or wife, the survivor may freely dispose of the *Gananciales*, although he or she may enter into a second or third marriage, and children of the first be living, without being obliged to reserve for such children, either the property or proceeds of such *Gananciales*.

"The wife," says Febrero, (1 *Feb. Mej.* 225, *sec.* 19,) " is " clothed with the revocable and *feigned* dominion and posses- " sion of one half of the property acquired by her and her hus- " band during the marriage ; but, after his death, it is trans- " ferred to her effectively and irrevocably, so that, by his de- " cease, she is constituted the absolute owner in property and " possession of the half which he left."   But he observes, in the next section, " The husband needs not the dissolution of the " marriage to constitute him the real and veritable owner of all " the *Gananciales*, since, even during the marriage, he has in " effect the irrevocable dominion, and he may administer, ex- " change, and, although they be neither *castrenses* nor *quasi* " *castrenses*, acquired by him, may sell and alienate them at his " pleasure, provided there exist no intention to defraud the " wife.   For this reason, the husband living, and the marriage " continuing, the wife cannot say that she has any *Gananciales*, " nor interfere with the husband's free disposition thereof, under " pretext that the law concedes the half to her, for this conces- " sion is intended for the cases expressed and none other."

The doctrine contended for by the plaintiff is, in effect, not only that the community of goods between husband and wife continues after the death of the latter, but that new associates, the children of the marriage, are introduced into the society, and inherit an absolute and indefeasible estate from the mother, who had only the *feigned* and revocable dominion.   The chil- dren of the marriage are no more the forced heirs (*herederos forzados*) of the wife than of the husband, and they have the right of succession to, not merely one half, but four fifths of the common property, so that, without legal cause, they cannot be disinherited. (2 *Feb. Mej.* 30, *sec.* 13 ; *id.* 35, *sec.* 13.)   And yet, fraud being out of the question, there can be no doubt that the father may freely alienate this property during his life time,

and by his last will direct the sale, distribution and alienation of it for the payment of debts. (2 *Feb. Mej.* 163, *sec.* 12 ; 2 *Sala Mej.* 225, *sec.* 7.)   It is true, that the heirs of a deceased wife have the right of succession to her property, and if it should happen that they are not also the heirs of the surviving husband, an account would have to be taken and a division made ; but if the heirs of the deceased wife be the children of the marriage, they have the right of succession, not to the half but to the whole *estate*, with the right in the father to dispose of one fifth.   But by the *estate* in law is understood the *residue*, after all debts have been paid, whether contracted during the continuance of the marriage or after the death of the wife. (2 *Sala Mej.* 259, *sec.* 24.)

A father may dispose of his property, not only for the payment of debts, but for any other honest purpose, and it is only when an intention to defraud his children of their legitimate inheritance is proved, that this natural prerogative of the parent can be restrained by an application to the judge. ( *Vid. Aiora de Partitionibus, Pars* 3, *q.* 22.)

But what renders the position of the plaintiff more singular is, that the will of Alviso disposes of the estate precisely as the law would have done, if he had died intestate ; and the executor has merely executed what the law itself would have ordained.   Not even the fifth is given to strangers, but the children are instituted heirs to the whole.   The important and essential part of a testament is the institution of an heir. (2 *Feb. Mej.* 26, *sec.* 1.)   With a particular restriction in regard to this imposed by positive law, a person may dispose of his property as he pleases.   He may direct the sale of his goods, or the distribution of them *in specie.*   He may leave the execution of his testament to the instituted heir, where the law places it, or commit the trust to a stranger, and in case of both being unwilling to act, the judge will make the appointment.   But in every case the executor, whether testamentary, legitimate, or dative, has only to carry into effect what the testator has ordained, for the will of the testator is the law of executors.   (2 *Feb. Mej.*

157; *Aiora de Partitionibus, Pars* 1, *cap.* 1, *N.* 9; *id. Pars* 3, *qu.* 24, *N.* 72.)

It results from my investigation that, after the death of his wife as well as before, Alviso had the entire control and right of disposition of the whole *Gananciales;* that no estate vested in the children in the one half of the common property, on the decease of their mother; that they had only a contingent and defeasible interest in it, which could never become perfect until the death of their father, and then, only after the payment of his debts; that Alviso in devising the premises in controversy for the payment of his debts was only carrying into execution what the law would have done without his directions, and that the dispositions contained in his will are legal and valid. It would be a startling doctrine to hold that, on the death of the wife, one half of the common property immediately vested in the children of the marriage, without reference to the payment of the debts contracted by the husband for the benefit of the joint community; and yet to this must we come if the plaintiff's position be correct. The common property should be and is, not one half but the whole, a security for the payment of debts contracted for the common benefit, and also by the husband after the death of the wife, and neither the heirs of the wife nor of the husband have any interest, except in the portion which shall remain after the payment of such debts.

I have examined the questions involved in this case at some length, because there may be many estates in this state the titles to which may depend upon the same or similar principles. The judgment must be affirmed.

Ordered accordingly.