Reade v. de Lea.

---

[No. 1166, February 26th, 1908.]

D. M. READE, Appellee, v. PILAR S. deLEA, Appellant.

SYLLABUS (BY THE COURT).

1. It is the settled doctrine of this court that property rights of a husband and wife are, except as modified by local statute, to be judged by the Spanish law in force in this Territory at the date of its acquisition from Mexico.

2. Under the community system, which was a part of that system of law, the wife had, until the termination of the marriage relation, no vested or tangible interest in the community property and her interest therein was a mere expectancy similar to that which an heir possesses in the estate of an ancestor.

4. Under that system the husband on the other hand was, so long as the marriage relation existed, for all practical purposes, the real and veritable owner of the community property.

4. Under that system the husband, subject always to the limitation that he should not act in fraud of his wife's expectancy, had, during the marriage relation, full power to sell

Reade v. de Lea.

community property and it was not necessary that his wife join in the conveyance.

5. The right of alienation by his personal deed thus given the husband attaches as a vested right in community property as such is acquired and such right is not subject to legislative interference.

6. The act of March 20, 1901 (L. 1901, c. 62, sec. 6) providing that neither husband nor wife shall dispose of real estate acquired during coverture by onerous title, unless both join in the execution of the deed, does not affect such property, acquired prior to the passage of the act.

7. A deed executed subsequent to that act for property deeded to the husband for valuable consideration previous to the act and during the marriage relation, conveys the title, although such deed was signed only by the husband.

Appeal from the District Court for Dona Ana County before FRANK W. PARKER, Associate Justice. Affirmed

NUMA C. FRENGER for Appellant.

The rules of the civil law, as they existed in New Mexico at the time the Territory was ceded to the United States, with reference to community property, still prevail, except in so far as changed or modified by statute. In adopting the community system a state is bound by principles of the civil law and its interpretations. Chavez v. McKnight, 1 N. M. 147; Barnett v. Barnett, 9 N. M. 205; Crary v. Field, 9 N. M. 222; Ballinger on Com. Prop., sec. 225; Compiled Laws 1897, sec. 2030; Compiled Laws 1884, sec. 1411; Nov. Sala Mexicano, sec. 2a, de titulo IV, par. 1; Session Laws 1889, ch. 90; Session Laws 1901, ch. 62, sec. 6; Hill v. Young, 34 Pac. 144; Warburton v. White, 176 U. S. 184; Smith v. Smith, 12 Cal. 217, s. v. 73 Am. Dec. 533; Hall's Mexican Law, secs. 2669, 2671, 2677; Walton's Civil Law in Spain and Spanish America, articles 1412 et seq., 1435, 1436, 1441, 1444; Beard v. Knox, 5 Cal., 256, s. c. 63 Am. Dec. 125; Fuller v. Ferguson, 26 Cal. 569; Kircher v. Murray, 54 Fed. 617; Dixon v. Dixon's Executors, 23 Am. Dec., La. 478; Thompson v. Cragg, 24 Tex. 582; Veramendi v. Hutchins, 48 Tex. 31; 8 Caruth v. Grigsby, 57 Tex. 265; Crary v. Field, 9

N. M. 222; Carpenter v. Lindauer, 78 Pac. Rep., N. M. 57.

The husband is not the sole and absolute owner of community property. The interest of the wife is more than a mere expectancy. Each consort has an equal half interest in community property. Novisima Sala Mexicano, sec. 2a, titulo IV. Escriche's Diccionario Razonado de Legislacion y Jurisprudencia, tomo 2, pp. 86 et seq,; Febrero Novisima (Tapia on Febrero, Don Jose Febrero) vol. 1, capitulo VIII, "De los Bienes Gananciales", pp. 95 et seq.; Libro X, Novisima Recopilacion, titulo IV; Wright v. Hays, 10 Tex. 120, s. c. 60 Am. Dec. 200; Babb v. Carroll, 21 Tex. 617; Thompson v. Cragg, 24 Tex. 582; Van Sickle v. Callett, 75 Tex. 409, s. c. 13 S. W. Rep. 31; Check v. Bellows, 17 Tex. 613; Fullerton v. Doyle, 18 Tex. 4; Forbes v. Moore, 32 Tex. 196; Johnson v. Harri on, 48 Tex. 257; Veramendi v. Hutchins, 48 Tex. 31; Caruth v. Grigsby, 57 Tex. 265; Parker v. Chance, 11 Tex. 513; Garrosi v. Garrosi, 1 Porto Rico Fed. Rep. 230; Kircher v. Murray, 54 Fed. 617; Lichty v. Lewis, 63 Fed. 535; Hall's Mexican Law, sec. 2707; Walton's Civil Law in Spanish America, articles 1392 et seq., articles 1401, 1426, 1433; Warburton v. White, 176 U. S. 184, s. c. Book 44 Lawyer's ed. 555; Barnett v. Barnett, 9 N. M. 205; Crary v. Field, 9 N. M. 223; Babb v. Carroll, 21 Tex. 765; Johnson v. Harrison, 48 Tex. 257; 23 Am. Dec., La., 478; Gillett v. Warren, 10 N. M. 523; Smith v. Smith, 12 Cal. 217, s. c. 73 Am. Dec. 533; Ballinger on Com. Property, secs. 5, 6, 8, 9, 11, 15-19, 32, 34-36, 38, 74, 76-78; Schmidt's Civil Law of Spain and Mexico, art. 67; Ballinger on Com. Property, 394, 397; 21 Cyclopedia of Law and Procedure 1633 et seq.

While the husband had power to alienate community property without the wife joining in the conveyance, this power was that of an administrator or trustee of the conjugal society, association, partnership or company, and to change or modify this power is not depriving him of any vested right. Novisima Sala Mexicano, supra; Escriche, Bienes Gananciales, supra; Febrero, Novisima, supra; Novisima Recopilacion. supra; Scott v. Maynard, Dallam's Decisions, Texas 548; Wright v. Hays, 10 Tex. 129, s. c. 60

Reade v. de Lea.

Alm. Dec. 200; Check v. Bellows, 17 Tex. 613; Fullerton
v. Doyle, 18 Tex. 4; Thompson v. Cragg, 24 Tex. 582;.
Lichty v. Lewis, 63 Fed. 535; Garrosi v. Garrosi, 1 Porto
Rico Fed. Rep. 230; Ballinger on Community Property,
secs. 17, 33, 79, 81-83, 88, 396; Schmidt's Civil Law of
Spain and Mexico, art. 51; Holyoke v. Jackson, 3 Pac. Rep.
841; Myer on Vested Rights, secs. 278, 1083 and cases cited;.
Maynard v. Hill, 125 U. S. 190; Hamilton v. Dudley, 2
Peters, 492; McGhee on Due Process of Law, pp. 35, 37,
40, 123, 140-142, 144, 145, 148, 150, 151, 155, 160, 161,
186, 201, 203, 204, 206, 207 and cases cited, 300, 328, 333
and 366; Warburton v. White, 176 U. S. 184, s. c. Book 44,.
I, ed. 555; Dixon v. Dixon's Executors, 23 Am. Dec., La.
478.

FALL & MOORE, MOORE & PAXTON, for Appellees..

The Spanish-American Law as to Community or ac--
quest property became the law of this Territory from
the time of the cession, and is still in force in so far as
the same has not been modified by statute. Strong v.
Eakin, 11 N. M. 113.

The laws in force where a contract is made and where
it is to be performed, enter into it and form a part of it,
as if they were expressly referred to or incorporated in its.
terms. And this is true of a contract of marriage. U. S.
ex rel. Von Hoffman v. Quincy, 71 U. S. 535-555, 18 L.
Ed. 408, 409; McCreary v. Davis, S. C., 28 L. R. A. 658-
661; Gaines v. Gaines, 9 B. Monroe, Ky., 295, 48 Am. Dec.
436; Conner v. Elliott, 59 U. S. 591, 15 L. Ed. 498; Dixon
v. Dixon's Executors, 4 La. 188, 13 Am. Dec. 480, 481.

No state shall pass any law impairing the obligation
of contracts. Fed. Const., Art. 1, sec. 10; Louisiana ex
rel. Ranger v. New Orleans, 102 U. S. 206, 207, 26 L. Ed.
133.

A vested right means the power to do certain actions
or possess certain things according to the laws of the land.
Calder v. Bull, 3 Dan. 394. 1 L. Ed. 652; Bailey v. P. W.
& B. R. R. Co., Harr., Del. 389, 44 Am. Dec. 602; Man-
delbaum v. McDonnell, 29 Mich. 78, 18 Am. Rep. 83.

Under the Spanish-Mexican community property law,.

in force in New Mexico when the marriage was celebrated and when the land in question in this suit was acquired, the husband acquired said land by an absolute and vested title, during the subsistence of the community, save only that he could not dispose of said land in fraud of the wife's expectancy; and the wife, during the subsistence of the community, acquired no vested interest in or to said land, but only a revocable and fictitious ownership or a mere expectancy. Escriche Diccionario Razonado de Legislacion y Jurisprudencia, tom. II., page 86 (Bienes Gananciales); Febrero, Bk. 1, ch. 4, par. 1, Nos. 29 and 30, Febrero Mexicano, sec. 19, p. 225; Tapia on Febrero, vol. 1. chap. 8, secs. 17 and 20; Schmidt's Civil Law of Spain and Mexico, Art. 51; Ball. Com. Prop. 396, secs. 5, 6; Barnett v. Barnett, 9 N. M. 209-214; Hagerty v. Harwell, 16 Tex. 665, 666; Meyer v. Kinzer, 12 Cal. 247, 73 Am. Dec. 538, 539, 542, 543; People v. Swalm, 80 Cal. 46, 13 Am. St. Rep. 97-99; Greimer v. Greimer, 58 Cal. 119; Spreckles v. Spreckles, 116 Cal. 339, 58 Am. St. Rep. 170-177; Guice v. Lawrence, 2 La. Ann. 226; Cummings v. Cummings, Cal., 14 Pac. 564; Petty v. Petty, 4 B. Monroe, Ky., 215, 39 Am. Dec. 501-505; Stroup v. Stroup, 149 Ind. 179, 27 L. R. A. 527; 1 Blackstone Comm. 445.

Under the Spanish-Mexican law the wife is neither a necessary nor a proper party to a suit involving title to community property. Consequently she has no legal or equitable vested interest therein. The title must vest somewhere. Where but in the husband? Althof v. Conheim, 88 Cal. 230, 99 Am. Dec. 364; Jergens v. Schiele, 61 Texas 255; Bofil v. Fisher, 3 Rich. Eq., S. C. 1, 55 Am. Dec 630, 631; Bent v. Maxwell L. G. & Ry. Co., 3 N. M. 244.

No state shall make or enforce any law which shall deprive any person of property without due process of law. Fed. Const., Amendment 14.

The marriage having been contracted under the Spanish-Mexican law, the husband's right to dispose of the community property cannot be taken away or impaired, as to property already acquired, by a statute enacted subsequently to the acquisition of the property and the vesting of the right. Spreckels v. Spreckels, 116 Cal. 339, 58 Am. St.

Reade v. de Lea.

Rep. 170-177, 36 L. R. A. 499-502; Moreau v. Detchemendy, 18 Mo. 526-529; O'Connor v. Harris, 81 N. C. 283-285, and cases cited; Westervelt v. Gregg, 12 N. W. 205, 62 Am. Dec. 160-166; Sutton v. Askew, 66 N. C. 272, 8 Am. Rep. 500; Cooley Const. Lim., 6 ed. 440; Rose v Rose, 104 Ky. 48, 41 L. R. A. 354, 355; Gladney v. Sydnor, 172 Mo. 318, 72 S. W. 554, 94 Am. St. Rep. 521-528.

The Washington doctrine of Community property. Brotton v. Langert, 1 Wash, 79, 23 Pac. 688; Mabie v. Whittaker, Wash., 39 Pac. 172; Hill's Wash. Stat., secs. 1399, 1400, 1402, 1403, 1446, 1448, Ball. Com. Prop. 371-373, 376, 377; Littell v. Miller, 3 Wash. St. 280, 28 Pac. 1035; Warburton v. White, 176 U. S. 484, 44 L. Ed. 555; Hill v. Young, 7 Wash. 33, 34 Pac. 144; Holyoke v. Jackson, 3 Wash. 235, 3 Pac. 842.

Statutes should not be allowed a retroactive operation, where this is not required by express command or by necessary and unavoidable implication. Murray v. Gibson, 15 How. 423, 14 L. Ed. 756; Potter v. Rio Arriba L. and C. Co., 4 N. M. 661-664.

### STATEMENT OF FACTS.

One Adolpho Lea and the defendant Pilar S. de Lea, were married in December, 1851, and continued to be husband and wife until the former's death intestate in Dona Ana County in April 23, 1902. The premises involved were acquired by two conveyances running to the husband Adolpho, dated respectively April 6, 1889, and June 14. 1893. In April 1902, and thus only a few weeks before his death, the husband for a valuable consideration executed to D. M. Reade a warranty deed for the land in dispute. The wife did not join in the deed. Reade brought suit to quiet the title against the wife and the trial court, holding that she had no interest in the land, rendered judgment for Reade, from which decision she prosecutes this appeal.

Reade v. de Lea.

## OPINION OF THE COURT.

POPE, J.—(After making the foregoing statement of the facts.)

The case turns upon the effect of the deed from Adolpho Lea to Reade. The appellant contends that it conveyed no title because the wife did not join as required by Section 6 of Chapter 62 of the Laws of 1901, which provides that "neither husband nor wife shall convey, mortgage, incumber or dispose of any real estate or legal or equitable interest therein acquired during coverture by onerous title unless both join in the execution thereof." The appellee concedes that the property was acquired during coverture by onerous title. He admits that if that act is applicable the judgment was wrong. He contends, however, that the act cannot apply to property acquired previous to its date, for the reason that, as to such, vested rights existed in the husband which it was beyond the power of the legislature to take away by requiring the wife to join. Was the trial court right in sustaining this view? This involves an inquiry as to what were the rights of the husband in the property prior to the act of 1901.

This court has in a number of cases dealt with questions of property rights between husband and wife and has uniformly recognized the civil law, in the absence of specific statute, as controlling. A brief review of former decisions of this court upon this point will demonstrate this.

In Chaves v. McKnight, 1 N. M. 148, decided in 1857, opinion by Judge Brocchus, it was held that the civil law was the rule of practice in this Territory and that by its terms the wife acquires a tacit lien or mortgage upon the property of the husband to the amount of the dotal property of which he became possessed through her. This case has been referred to in one or two very recent decisions of this court. (Ilfeld v. Baca, 14 N. Mex. 65; In Re Myer, 14 N. Mex. 45. In Martinez v. Lucero, 1 N. M. 208, decided the same year by the same judge, it was held, applying the civil law, that during marriage the administration of the dotal property belongs exclusively to the husband and the wife

cannot during the conjugal association recover it from her husband without showing waste or dissipation of it by her husband. In Laird v. Upton, 8 N. M. 409, 415 (opinion in 1897 by Mr. Justice Collier) reference is made to the community system and the presumption inhering in that system that all acquisitions during marriage are community property. In Barnett v. Barnett, 9 N. M. 207, opinion by Chief Justice Smith, it was held that in the absence of any statute ascertaining the rights of husband and wife, after legal separation and during the lives of each, the civil law of Spain governs and that under this law the wife by adultery forfeits the right which that law gives on dissolution of the community to one half of the community property. In Crary v. Field, 9 N. M. 229, s. c. 10 N. M. 257, the right of the surviving husband under the civil law to sell so much of the community realty as may be necessary to pay the community debts is declared and the validity of such a sale is upheld. In Neher v. Armijo, 9 N. M. 235, opinion by Mr. Justice Crumpacker, it is held, announcing a familiar civil law doctrine, that the legal presumption that property acquired by either husband or wife during the matrimony is community property, may be overcome by clear and conclusive proof to the contrary. In Gillett v. Warren, 10 N. M. 523, 542 (opinion by Mr. Justice Parker) the community system is recognized as in force and it was there held that the surviving husband not only had the power under the system to sell community real estate, in payment of community debts, (as ruled in Crary v. Field *supra*) but community personalty as well. In Strong v. Eakin, 11 N. M. 107, (opinion by Mr. Justice McFie) the Spanish law as to community or acquest property is again held to be in force in so far as not abrogated by statute, and, interpreting that law, it is held that all property acquired and held by husband and wife during coverture, is presumed to be community property and to be subject to community debts and that every debt contracted during marriage is likewise presumed to be a community debt. In Brown v. Lockhart, 12 N. M. 10 (opinion by Chief Justice Mills) the doctrines announced in Strong v. Eakin, *supra,* are reiterated. In Mc-

Allister v. Hutchinson, 12 N. M. 111, 117, (opinion by Mr. Justice Baker) the civil law community system is recognized as governing the alienation of marital property. From the foregoing we consider it declared by the harmonious decisions of this court, both before and since the introduction of the common law by the act of January 7, 1876, (C. L. Sec. 2871) that the civil law controls the present case unless modified by the act of 1901. Indeed, this is not controverted by counsel in their briefs.

It only remains therefore, to determine, *first*, what was the nature of the community system as to matters of property; *second*, what were the husband's rights as to such property, (the marriage still existing), at the date of the act of March 20, 1901; and *third*, what effect if any that act had upon such rights.

The general principles applicable to the community system are declared with great unanimity by the authorities. Upon marriage, the law recognized a partnership between the husband and wife, as to property acquired during such relation, by title not gratuitous. Schmidt, Law of Spain and Mexico, pp. 12-14. The relationship has been variously described as a community of property (Ballinger on Community Property, Section 18), a conjugal partnership (Childers v. Johnson, 6 La. Ann. 634; Mabie v. Whittaker, 10 Wash. 662); a matrimonial co-partnership (Ord v. De La Guerra, 18 Cal. 67) a property partnership (Fuller v. Fergusson, 26 Cal. 569). Of course the word partnership as thus used is a matter of mere analogy, since the marital relation, viewed in its business aspect, differs very evidently from the commercial partnership. Ballinger, Sec. 16. Under the community system the husband has the fullest power of management and disposition of the community property subject only to the condition that he shall not act in fraud of his wife. He has the right to sell community property, real or personal, during her life time without her consent. Suc. of Cason, 32 La. Ann. 792; Brewer v. Wall, 23 Tex. 585, 76 A. D. 76; McAllister v. Hutchinson, 12 N. M. 117; Garrosi v. Dastas, 204 U. S. 64. He might give it away, Smith v. Smith, 12 Cal. 216, 73 A. D. 535; Lord v. Hough, 43 Cal. 581; Spreckles v.

Reade v. de Lea.

Spreckles, 116 Cal. 339; Trahan v. Trahan, 8 La. Ann.
455, at least to relatives, in moderate amount, Schmidt,
Art. 54; 1 Febrero Mejicano, C. 10, Sec. 20, p. 226. In all
suits affecting the community property the wife is not a
party, but such suits must be brought by the husband, Mott
v. Smith, 16 Cal. 534; Spreckles v. Spreckles, 116 Cal.
339; Moseley v. Heney, 66 Cal. 478, Murphy v. Coffey,
33 Tex. 508, or against him. Althof v. Conheim, 38 Cal.
230, 99 A. D. 363. If the community property be stolen
the indictment alleges that he is the owner. State v. Gaf-
fery, 12 La. Ann. 265; and his wife's consent to the taking
of the property affords the thief no defense. People v.
Swalm, 80 Cal. 46, 13 A. S. R. 96.

    While all these characteristics of the community are
generally admitted by the law writers a very marked
difference of authority is encountered when we come to
define the relative estates of the spouses in the community,
the precise question here. The "perplexity" of this question
is noted by Mr. Ballinger in Section 32 of his very use-
ful work. The divergence of opinion is present here, for
it is contended by the appellants that the wife is the half
owner of the community estate, that the plenary powers
given her husband are purely as an agent or trustee and
not of his own right, and that as a corollary from this the
legislature may change or limit these provisions without
interfering with vested rights, the argument being that
there can be no vested right to administer a trust. On the
other hand it is urged by appellees that the complete dom-
inion of the husband over the community estate is a proper-
ty interest held as a present personal right and this vested
beyond possibility of legislative interference.

    The cases containing expressions upon the relative es-
tates of husband and wife under the community law are
quite numerous, but an examination of these will develop
that such expressions are usually made *arguendo* and often
without distinguishing between such rights during the mar-
riage relation and after its dissolution. The later decis-
ions also are more or less influenced in their views by stat-
ute and by the modern tendency toward greater property
rights for the weaker sex. In dealing with the matter we

have found the greatest help in the early authorities from the civil law states, where the courts have dealt with the subject in the very light of the ancient law, aided by a bar trained under that system and where they have, thus uninfluenced by modern thought, declared what the Spanish law was, not what in the light of advancing civilization it should have been.

Consulting these authorities, it is found that those from the State of Texas countenance at least the first of the propositions urged on behalf of the appellants and in Washington are found decisions sustaining all three. Thus it was said in the early Texas cases of Wright v. Hayes, 10 Tex. 136, 60 A. D. 200 : "The rights of property of husband and wife in the effects of the community are perfectly equivalent to each other. The difference is this, that during coverture her rights are passive; his are active." Proceeding to hold that upon abandonment of the wife by the husband, the wife has the power to manage and sell community property, the court observes: "Her right in that property is equal to that of the husband. During his presence he has the administration, subject to the trust encumbered upon the property. This right of control must necessarily cease when he can and will no longer exercise it; and the wife, the other joint owner. must be vested with the authority or it cannot exist anywhere."

This right of the wife to administer the community property upon abandonment by her husband has been repeatedly recognized by the Texas courts. Check v. Bellows, 17 Tex. 613 ; Veramendi v. Hutchins, 48 Tex. 550 ; Zimpleman v. Robb, 53 Tex. 274; and has been recognized in the case of the husband be confined to the penitentiary. Slator v. Neal, 64 Tex. 222, and in one case it was held that this applied even in the case of his insanity. Forbes v. Moore, 32 Tex. 196. So far however as Wright v. Hayes and the subsequent Texas cases above cited tend to declare that the wife's and husband's titles are *legally* equal under the community system they are discountenanced by the later cases of Edwards v. Brown, 68 Tex. 329, and Patty v. Middleton, 82 Tex. 586, which declare that the spouses have "an

equal *beneficial* interest". This modification of the original Texas doctrine is pointed out in Sadler v. Neisz, 5 Wash. 182, a case from the other jurisdiction supporting the enlarged view of the wife's rights under the community system. The extent of the wife's rights in the Texas community are also discussed by Judge Maxey in Kircher v. Murray, 54 Fed. 626, where, upon a full review of the Texas cases, she is declared to have only "an *equitable* interest and title."

In Washington the early case of Holyoke v. Jackson, 3 Wash. Ter. 235, went to the full length of the propositions above named. This being the authority principally relied upon by appellant we shall consider it with some detail. In that case it appears that the legislature of 1879 passed an act similar to our act of 1901, requiring the wife to join with the husband in disposing of community property. The husband without joining his wife and subsequent to that law contracted to convey community property. The validity of that act was the question. It was there said: "It (the community) is like a partnership, in that some property coming from or through one or other or both of the individuals forms for both a common stock, which bears the losses and receives the profits of its management, and which is liable for individual debts; but it is unlike, in that there is no regard paid to proportionate contribution, service, or business fidelity; that each individual, once in it, is incapable of disposing of his or her interest; and that both are powerless to escape from the relationship, to vary its terms, or to distribute its assets or its profits. In fixity of constitution a community resembles a corporation. It is similar to a corporation in this, also, that the state originates it, and that its powers and liabilities are ordained by statute. In it the proprietary interests of husband and wife are equal, and those interests do not seem to be united merely, but unified; not mixed or blent but identified. It is *sui generis*, a creature of the statute, and by virtue of the statute this husband and wife creature acquires property. That property must be procurable, manageable, convertible,

and transferable in some way. In somebody must be vested a power in behalf of the community to deal and dispose of it. To somebody it must go in case of death or divorce. Its exemptions and liabilities as to indebtedness must be defined. All this is regulated by statute. Management and disposition may be vested in either one or both of the members. If in one, then that one is not thereby made the holder of larger proprietary rights than the other, but is clothed, in addition to his or her proprietary rights with a bare power in trust for the community. This power the statute of 1873 chose to lay upon the husband, while the statute of 1879 thought proper to take it from the husband, and lay it upon the husband and wife together. As the husband's 'like absolute power of disposition as of his own separate estate,' bestowed by the ninth section of the act of 1873, was a mere trust conferred upon him as a member and head of the community, in trust for the community, and not a proprietary right, it was perfectly competent for the legislature of 1897 to take it from him and assign it to himself and his wife jointly. This was done. When, therefore, in 1880, the plaintiff in error, without his wife, entered into an agreement to sell the land in question, he agreed to do what he himself, by himself could not do, and therefore could not agree to do. To make an actual sale or conveyance without his wife, he had no power. The law says such a thing shall not be done."

There are similar expressions in Mabie v. Whitaker, 10 Wash. 656. It is unnecessary to consider how far the Washington decisions are influenced by the fact that the community system in that state is, as pointed out in Brotton v. Langert, 1 Wash. 79, purely a creature of local statute; nor how far Holyoke v. Jackson is discredited by certain expressions in the later case of Sadler v. Neisz, 5 Wash. 182, from the same court or by the fact that Hill v Young, 7 Wash. 33, another Washington case, seems to consider as an open question the very point ruled by Holyoke v. Jackson. We forbear the discussion of these questions, for the reason that we believe the case of Holyoke v. Jackson, even conceding to it all that may be claimed upon these matters of detraction, is against the great weight

Reade v. de Lea.

of authority explanatory of the Spanish community system and its assumptions as to the rights of the spouses, are contrary to the spirit of the civil law. These authorities we will proceed to consider in detail.

Among the earliest decisions are those from Louisiana. That court is entitled to peculiar respect because of the high learning of its early judges in civil law matters. Perhaps the first accessible case dealing with these questions is Dixon v. Dixon's Executors, 4 La. 188, 23 A. D. 478, decided in 1832. In that case there are expressions to the effect that the wife has a present right to a share of the acquest property, arising not as a result of dissolution of the marriage but as originating out of the very marriage contract. It is recognized in that case, however, that the doctrine thus announced is contrary to authority, for we find the following language: "We are aware the principles here recognized do not correspond with the doctrines taught by the highest authorities in the French law, by Domonlin, Pothier and Toullier. They hold that the wife has no right whatsoever until the marriage is dissolved or the community otherwise terminates. That she has nothing but a mere hope or expectancy." The court seeks, however, to distinguish the French law from the law of Louisiana upon the ground that the latter (borrowed from the Spanish law) permits the wife, upon the death of her husband, to bring an action to set aside an alienation made in fraud of her, by him, during coverture. It is argued as follows: "'The exercise of such a right does appear to us utterly opposed to the principle that the wife has no interest in the property until the community is dissolved; for if she has not, how can she maintain an action to set aside the alienation?" The effect of this case as authority and an answer to the argument it makes is found in the later and leading case of Guice v. Lawrence, 2 La. Ann. 226, decided in 1847. In that case it is distinctly held that the laws of Louisiana, like those of Spain, recognize no title in the wife during marriage to any part of the acquets and that

she becomes the owner of the one-half only after the dissolution of the marriage. In speaking to this point the court says: "The laws of Louisiana have never recognized a title in the wife during marriage, to one-half of the acquets and gains. The rule of the Spanish law on that subject is laid down by Febrero, with his usual precision. The ownership of the wife, says that author, is revocable and fictitious during marriage. As long as the husband lives and the marriage is not dissolved, the wife must not say that she has *gananciales,* nor is she to prevent the husband from using them under the pretext that the law gives her one-half. But, *soluto matrimonio,* she becomes irrevocably the owner of one undivided half, in the manner provided by law for ordinary joint ownership. The husband is, during the marriage, *real y verdadera dueno de todos, y tiene en el efecto de su dominio irrevocable.* Febreró Adic, tomo 1 y 4, Part 2d, bk. 1st, chap. 4, parag. 1, Nos. 29 and 30; Pothier Communante, p. 35 and following; 12 Toullier, Chap. 2, Nos. 72 to 31; 14 Duranton, Droit Franc., p. 281, and foll.; 10 Dalloz, Jurisp. p. 198 and fol. The provisions of our code on the same subject are the embodiment of those of the Spanish law, without any change. The husband is head and master of the community, and has power to alienate the immovables which compose it by an encumbered title, without consent or permission of his wife. Civil Code, art. 2373."

Referring to the argument above quoted from Dixon v. Dixon supra, it is said: "With the reasoning of the court in 4th La. we cannot agree, although the conclusions to which they come may have been correct on other grounds. The difference supposed by the court to exist between our code and that of France is imaginary. Under both, cases of fraud are excepted from the general power given to the husband to alienate the acquets and gains. See 7th Sierey, 1st Sect., p. 401. The proviso of Art. 2373 cannot be construed as giving or recognizing a title to or in the wife. As well might it be said that children have a title in the

Reade v. de Lea.

property of their father, because he is prohibited from disposing of it in fraud of their *legitime*."

We may interpolate here the observation that the right of the wife, during the husband's lifetime, to proceed in equity to set aside a conveyance in fraud even of dower, is well established. Smith v. Smith, 12 Cal. 216, 73 A. D. 533, citing Swaine v. Perrine, 5 Johns. Ch. 482; Stroup v. Stroup, 140 Ind. 179, 27 L. R. A. 527, Petty v. Petty, 4 B. Mon. (Ky.) 215; and yet dower under the common law system is a mere expectancy, constituting during the husband's lifetime no vested right, and being subject to legislative repeal or limitation at any time before it vests by the husband's death. Randall v. Kreiger, 23 Wall. 148; Cooley's Cons. Limit. (7th Edit.) pp. 513-514; McNeer v. McNeer (Ill.) 19 L. R. A. 256 and note; monographic note to Rose v. Rose, 84 A. S. R. 430, 446.

Recurring from this observation upon a common law parallelism, to the Louisiana authorities, we find language similar to Guice v. Lawrence in Succession of Boyer, 36 La. Ann. 506, 511, where it is said: "Under our law the husband is head and master of the community. During its existence he may dispose of its effects as he pleases, subject only to the right of the surviving wife, upon its dissolution, to proceed against his heirs for one half of the same, provided she can prove that the transfer or other disposition was made with the fraudulent intent to injure her. In fact the wife has during the marriage no vested proprietary interest in any property composing the community but only an inchoate right which entitles her to the hope or expectation that if she survives her husband she can receive or own half the property that may be left after payment of the community debts." In Suc. of Cason; 32 La. Ann. 792, it was said: "During the existence of the community the husband is practically the owner of the community property."

In the more recent Louisiana cases the doctrine of Guice v. Lawrence is consistently followed and that case also has the sanction of as high authority as the federal Supreme Court. In the recent case of Garrosi v. Dastas,

Reade v. de Lea.

204 U. S. 64, the appeal was from the United States District Court for Porto Rico. The trial court had held that upon dissolution by divorce of the marriage and the adjustment of the community rights there involved, the husband was chargeable with unreasonable or extravagant expenditures. In holding this to be error and in upbuilding the very broad powers of the husband during marriage it is said by the court speaking through Mr Justice White, himself a Louisiana lawyer and jurist:

"The question, therefore, is this: Is the power of the husband as the head and master and administrator of the community, in its nature so restricted that in the absence of express limitation he can, after dissolution of the community be called to account and compelled to return the community money which he has actually expended during the existence of the community, because, in the judgment of the court, such expenses may be deemed to have been not suitable to his situation in life, extravagant, or even reckless? To answer this question in the affirmative would be to destroy the whole fabric of the community system as prevailing, not only under the Spanish and Porto Rican codes, but as obtaining in those countries of the continent of Europe and here where that system prevails. We need not consider whether the community was derived from the Roman law, from an express provision of the early Saxon law, or from the ancient customary law of the continent. For, however derived, the very foundation of the community and its efficacious existence depend on the power of the husband, during marriage, over the community, and his right, in the absence of fraud or express legislative restriction, to deal with the community and its assets as the owner thereof. The purpose of the community, as expounded from the earliest times, whilst securing to the wife on the dissolution of the marriage an equal portion of the net results of the common industry, common economy and common sacrifice, was yet, as a matter of necessity, during the existence of the community, not to render the community inept and valueless to both parties by weakening the marital power of the husband as

Reade v. de Lea.

to his expenditures and contracts, so as to cause him to be a mere limited and consequently inefficient agent."

It is pointed out in the decision that under the law of France prior to the Napoleon Code, "the extent of the power of the husband as to the community property was so great that it was considered in theory that the rights of the wife in or to the community were not merely dormant during marriage but had no existence whatever" and "that the wife during the existence of the community had but a mere hope or expectancy and hence no interest whatever in the property or goods of the community until the community was dissolved" and that from this arose the legal epigram "that the community was a partnership, which only commenced on its termination."

Referring to the power of the husband over the community, the court quotes as follows from the French author Troplong:

"This power of the husband, which effaces the personality of the wife, and which is manifested by the name of lord and master of the community, given to the husband; this power, which seems like unto an absolute sovereignty, exists as well in the relations of the spouses between themselves as in their dealings between third parties. In effect, the husband can dissipate the goods of the community; he can lose, destroy, break and dilapidate. *Maritus potest perdere, dissipare, abuti.* This is an elementary axiom of the Palace (of Justice). The wife has no right to call the husband to account, no damage to obtain for his acts. Hence it is true, indeed, that the husband is more than an administrator; he is an administrator *com libera.*"

It is further pointed out by the court that while these principles of the French law were somewhat modified by the Code Napoleon the power of the husband under the Spanish system was in principle more extensive than it was under the Code Napoleon, and in elucidation of his authority under that system, the quotation which we have made above from Guice v. Lawrence is inserted in full, wherein, following Febrero Mejicano, it is said that the wife

must not say during coverture that she has *gananciales* under the pretext that the law gives her one half.

Next in age to the Louisiana decisions are those from Missouri. While the Spanish law of community was displaced in that state as early as 1807, there are several cases which discuss it. Thus, in Riddick v. Walsh, 15 Mo. 355, decided in 1852, it was said:

"By the Spanish law of community, the husband and wife became partners in all the estate, real and personal, which they respectively possessed. All that was acquired or purchased during coverture, whether real or personal estate, went into partnership, as being presumed to have been the fruits of the joint industry and economy of the husband and wife. On the dissolution of the partnership, by death, the surviving party and the representatives of the deceased, each took back what was brought on his or her side into the partnership in value or kind; in value, of personal estate, in kind, of real estate; and what remained being considered as gain or profits, was equally divided as between partners. The husband, being the most suitable person, managed the concerns of the partnership, and might, without the consent of the wife, dispose of any of the partnership effects, purchased during the marriage."

In Moreau v. Detchemendy, 18 Mo. 522, the question there involved was not dissimilar from that at bar. There, the inquiry was as to whether the introduction of the common law took away from the husband the right which existed in him previously under the community system of disposing of community property without the consent of the wife. In deciding this question in the negative the court uses the following language:—

"The right which the wife had in the property of the community acquired during the marriage was not the estate of a joint owner, entitled to claim its administration or to call the other owner to account. It is said by Febrero that the ownership of the wife is revocable and fictitious during marriage. As long as the husband lives and the marriage is not dissolved, the wife cannot say that she has acquisitions, nor is she to prevent her husband from using them, under the pretext that the law gives her one-

half.   But the marriage being dissolved, she becomes irrevocably the owner of one undivided half, in the manner provided by law for the joint ownership.  The husband is, during the marriage, the actual and true owner of all. (Febrero, book 1, Ch. 4, paragraph 1, Nos. 29 and 30)."

In Nevada, in dealing with a statute identical with the California Statute (which as we shall presently see, was simply declaratory of the Spanish community law), it was said in Crow v. Van Sickle, 6 Nev. 149:

"The power of management and absolute disposition of the common property thus conferred by the statute clothes the husband with such ownership and authority as to warrant the allegation in a complaint of this kind, that he is the owner of the chose in action.   Certainly the wife has no interest which will justify any interference on her part, nor has the defendant in such case any ground of complaint, for the plaintiff is the owner of a moiety and so far as the right of prosecuting the action is concerned, he is in effect the absolute owner of the entirety."

In California, as early as 1850 an act was passed "giving the husband the management and control of the community property, with the like absolute power of disposition (other than testamentary) as he has of his separate property."  This act has been treated by the courts of California as practically declaratory of the civil law.   Panaud v. Jones, 1 Cal. 488, Meyer v. Kinzer, 12 Cal. 248; so that the observations of that court on the Spanish community system are peculiarly pertinent.   The property right of husband and wife during the existence of the marriage were considered by the courts of that state as early as 1851, when the Supreme Court in Panaud v. Jones, 1 Cal. 488, 515, quotes, as defining the property rights of the spouses, the following from Febrero Mejicano, 225, Secs. 12 and 20: "The wife is clothed with revocable and *feigned* dominion and possession of one half of the property acquired by her and her husband during the marriage; but, after his death, it is transferred to her effectively and irrevocably, so that, by his decease, she is constituted the absolute own-

er in property and possession of the half which he left. The husband needs not the dissolution of the marriage to constitute him the real and veritable owner of all the *gananciales,* since, even during the marriage, he has in effect the irrevocable dominion, and he may administer, exchange, and, although there be neither *castrenses* nor *quasi castrenses,* acquired by him, may sell and alienate them at his pleasure, provided there exists no intention to defraud the wife. For this reason, the husband living, and the marriage continuing, the wife cannot say that she has any *gananciales,* nor interfere with the husband's free disposition thereof, under pretext that the law concedes the half to her, for this concession is intended for the cases expressed and none other."

In Van Maren v. Johnson, 15 Cal. 308, it was said, the opinion being by Mr. Justice Field: "The common property is not beyond the reach of the husband's creditors existing at the date of the marriage and the reason is obvious: the title to that property rests in the husband. He can dispose of the same absolutely, as if it were his own separate property. The interest of the wife is a mere expectancy like the interest which an heir may possess in the property of his ancestor," citing Guice v. Lawrence, 2 La. Ann. 226, *supra.* Likewise in Packard v. Arrellanes, 17 Cal. 539, it was said, the opinion being by Judge Cope and concurred in by Justice Field: "During the marriage the husband is the head of the community and the law invests him with discretionary power in all matters pertaining to its business or property. In fact, its business is conducted and its property acquired in his name and his authority in the administration of its affairs is exclusive and absolute. The wife has no voice in the management of these affairs nor has she any vested or tangible interest in the community property. The title to such property rests in the husband and for all practical purposes he is regarded by the law as the sole owner. It is true, the wife is a member of the community and entitled to an equal share of the acquests and gains; but so long as the community exists her interest

is a mere expectancy and possesses none of the attributes of an estate either at law or in equity."

This language was adopted *verbatim* as a part of the opinion of this court in Barnett v. Barnett, 9 N. M. 214, and must be regarded therefore as peculiarly persuasive. In Greiner v. Greiner, 58 Cal. 115, 118, it is reiterated that "the interest of the wife during the coverture was a mere expectancy, like the interest which an heir may possess in the property of his ancestor."

It is true that there are expressions in Beard v. Knox, 5 Cal. 252, 63 A. D. 125; DeGodey, v. Godey, 39 Cal. 157, and perhaps other California cases tending to support the view that during the existence of the community the wife has a present vested interest rather than a mere expectancy. That this is not the view of the California court, however, is shown not only by the cases first above cited, but also by the recent and well considered case of Spreckles v. Spreckles, 116 Cal. 339, 58 A. S. R. 170-177, 36 L. R. A. 499-502, where these latter cases are noted, reviewed and discredited and the California doctrine of Van Maren v. Johnson, *supra,* emphatically reiterated.

It being thus established by expressions from leading community law states, approved by this court and by the Supreme Court of the United States, that the wife had under the Spanish law "a mere expectancy" in the community property and that the husband pending the dissolution of the marriage relation was "the real and veritable owner of said property" with full power of alienation by his personal deed, can an act of the legislature requiring that a deed be signed by both his wife and himself be held constitutionally to apply to property previously acquired? We think it cannot. The wife's interest being merely an expectancy it constituted no vested right. The wife having no vested interest and its being evident that the proprietary right must be vested somewhere, it follows under the rule of exclusion that such right must be found in the husband. Among the incidents of this property right so vested in him was the right not only to hold but to convey. To detract from this last by statute was to take away a property right.

Mandelbaum v. McDonell, 29 Mich. 78, 18 A. R. 61; Bruce v. Strickland, 81 N. C. 267; Gladney v. Sydnor, 172 Mo. 333.

This very question was present in Spreckles v. Spreckles, *supra*. It was there considered whether the husband's right could be disturbed by a statute passed subsequent to the acquisition of the property involved, requiring the wife to join in gifts of community property. It will be perceived that the only difference between that case and the case at bar is that the California statute required the wife's-signature only in the case of gifts, whereas, our act of 1901 applies to all alienations. It was there held that the statute was without effect as to previously acquired property. A like question was present in the earlier California case of Ingoldsby v. Juan, 12 Cal. 564, 579, where, in dealing with a similar state of facts it was said: "But the subject of the act of the seventeenth of April was the separate property itself and that statute was passed to define and fix the relations of the parties to it; and by the sixth section the husband is made the manager of the separate property of the wife and then the power of sale by him is denied and the mode of sale fixed; but this only by obvious rules of construction, applies to separate property afterwards acquired or to property held, as separate, by women married after the passage of the act. The legislature had no power to affect marital regulations or rights fixed by law previously; and if they had, we are not to presume, in the absence of an express declaration to the effect, that they so intended."

A line of North Carolina cases further illustrates the principle. In Sutton v. Askew, 66 N. C. 145, it was held that where the wife had only an *inchoate* right of dower in her husband's lands, subject to be defeated at any time by the husband's conveyance, subsequent legislation restoring her the common law right of dower could not affect the rights of the husband nor restrict his power of alienation nor confer upon the wife any additional right of dower in lands acquired by the husband before the act was passed, although held to apply to lands acquired subse-

Reade v. de Lea.

quent to the act notwithstanding the marriage was before. Holliday v. McMillan, 79 N. C. 287; and in Bruce v. Strickland, 81, N. C. 198, it was said: "The marriage took place and the title vested in the defendant previous to the restoration by statute of the common law right of dower and before the creation of a homestead in land. It was *then* in the power of the defendant by his deed to convey a *full and complete title in fee* to the land. Has this absolute dominion over his property been abridged by an act of subsequent legislation or could it be, under the principles of the constitution, without the owner's consent or concurrence? The value of property consists in its use, disposition and conversion into something else and these are the elements constituting a vested right which the legislative body cannot take away except for public use and then only on making compensation to the owner. This security is guaranteed in the constitution of the United States in the clause declaring the obligations of contracts inviolable."

The Missouri cases of Moreau v. Detchemendy, 18 Mo. 522, cited *supra* and Gladney v. Sydnor, 172 Mo. 319, are similarly in point. In the latter case, it was held that the right of the husband who acquired his homestead prior to the act of 1905 (requiring the joining of the wife in the conveyance) to sell the homestead without the wife's joining is a vested right and that he could notwithstanding such act alienate property acquired prior to it without joining his wife in the deed. It is very fully pointed out in that case that the *jus disponendi* no less than the *jus tenendi* is an element of property protected against legislative confiscation. The case of Westervelt v. Gregg, 12 N. Y. 202, is similarly instructive.

We are of opinion, therefore, that the facts of this case when read in the light of the authorities bring it within the doctrine announced by this court in Newton v. Thornton, 3 N. M. 287, where, in construing our statute giving the value of improvements in ejectment to the party making them to be inapplicable to improvements erected prior to the act, it is said: "No legislature can take or destroy private property for private use by statutory enactments

and so far as this statute attempts anything of that kind it is clearly void." We therefore hold that the act of 1901 does not apply to community property previously acquired and that as to such the husband's rights of disposition is left intact. We may add that we find nothing' in Warburton v. White, 176 U. S. 486, opposed to the doctrine here announced. That case dealt with matters of succession, not the rights of spouses *in esse.* The court in that case expressly says: "No question is presented on this record of the nature and scope of his (the husband's) authority during the existence of the marriage, and we intimate no opinion on that subject"; and the court declined to review or consider Spreckles v. Spreckles, *supra* (which we have seen decides the very point here in issue), upon the ground that it was without pertinency to the question there involved.

The judgment is accordingly affirmed.

### DISSENTING OPINION.

ABBOTT, J.—In the judgment and opinion of the court, I do not concur and, as the questions involved are highly important, I state my reasons for dissenting.

That the property rights of husband and wife in this Territory are, except as modified by local statutes, to be judged by the Spanish law in force at the time of its acquisition from Mexico, need not be questioned, if, by the Spanish law is meant the law as it existed in modified form in Mexico at that time. But I cannot agree that under the community system as it is here, the wife has, until the termination of the marriage relation, no vested or tangible interest in the community property, but "only a mere expectancy similar to that which an heir possesses in the estate of an ancestor," and that the husband's power over the community property is a vested interest in the property itself, and not subject to legislative interference. In my view, the wife, has a present, fixed and definite interest in the community property, determinable as to any particular item of it through alienation by the husband and in other ways and although he has the exclusive power of managing and selling the common property, that power

is not a property right, but the authority necessary to the advantageous use of the property which, as a matter of public policy, may be intrusted to either or both of the parties to the community and changed from time to time as the legislature may determine, and that in consequence, the statute, Chap. 62, Sec. 6, Laws of 1907, by which the legislative assembly attempted to prevent the conveyance of community real estate by the husband without the consent of the wife, was a proper and valid exercise of power, as to real estate acquired before its passage as well as to that subsequently acquired.

In determining what the law was at the time of the acquisition of New Mexico there are doubtless unusual difficulties. Ballinger in his work on Community Property, Sec. 5, p. 26, says: "The absence of an authoritative code of law in Spain leaves all legal subjects open to the varying definitions of the authors on the subject of Spanish legislation, and being devoid of that judicial interpretation found in Anglo Saxon countries leaves the subjects of the law in a similar uncertainty to that prevailing in the science of philosophy and metaphysics."

There is, besides, the impossibility of finding in the terminology of the common law system, words which exactly represent ideas and things which are peculiar to another system.

It has been said by a noted writer that it is impossible for any one to put in words precisely what he thinks. If he cannot do that in his native language, how much further from accurate expression is he when he attempts to tell in his own language what another thought and inadequately expressed in another language. Especially is this the case when the whole way of thinking for centuries by the people using the one language has been so widely different from that of the people using the other, as that of the Spanish people has been from that of the Anglo Saxons on the subject here in question.

It plainly appears, I think, that some of our courts have forced the thoughts of Spanish law writers into verbal moulds of their own making and that they come to us in that somewhat distorted form.

No instance has been brought to our attention in which prior to the acquisition of Spanish territory by the United States, the right of the sovereign to change the method of administering community property has been denied. Nor is it suggested that any writer on the Spanish law has ever declared that the husband could not be deprived by law of the power of alienation which he had by the law. The possession of that power by the husband alone was not a necessary feature of the community system, since, as Ballinger says (section 3), in Gelderland, "The husband could not, without the wife's consent, alienate any part of the immovable property subject to the community." It is, however, alleged for the appellee, that such is the necessary inference from the passages quoted from the writers on Spanish law.

I find no such quotation either in the appellee's brief or in the majority opinion which seems to me to sustain or even favor that contention as against the doctrine that the husband is only the master of the community with power to alienate its property, with the possible exception of a passage cited from Tapia's Febrero, title: Bienes Gananciales. That, directly or indirectly, furnishes the greater part of the material both for the foundation and superstructure of the argument for the appellee's position. It was cited in Guice v. Lawrence, infra, and practically made the basis of the opinion in that case, and in Panaud v. Jones, 1 Cal. 488, served a like purpose. In Van Maren v. Johnson, 15 Cal. 308, Judge Field's dictum that the interest of the wife during marriage, in the community property "is a mere expectancy like the interest which an heir may possess in the property of his ancestor" adopted by this court in the case at bar, was based, by reference, on Guice v. Lawrence. Let us examine the passage on which so much has been made to depend. The citation is in English as quoted from Panaud v. Jones, supra.

"The wife is clothed with the revocable and *feigned* dominion and possession of one-half of the property acquired by her and her husband during the marriage; but, after his death, it is transferred to her effectively and irrevocably, so that, by his decease, she is constituted the ab-

sclute owner in property and possession of the half which he left. The husband needs not the dissolution of the marriage to constitute him the real and veritable owner of all the *Gananciales,* since, even during the marriage, he has in effect the irrevocable dominion, and he may administer, exchange, and although there be neither *castrenses* nor *quasi castrenses,* acquired by him, may sell and alienate them at his pleasure, provided there exist no intention to defraud the wife."

The Spanish has it thus: "A la mujer casada se comunica y trasfiere en habito y potencia el dominio y posesion revocable y ficta de la mitad de los bienes que durante el matrimonio gana y adquiere con su marido ; mas despues que este fallece, se le trasfiere irrevocable y efectivamente, de suerte que por su fallecimiento se constituye duena absoluta en posesion y propiedad de la mitad que deje, al modo que en los socios convencinales lo dispone la ley. Por esto a la mujer no solo la esta prohibido donar sus bienes dotales y gananciales durante el matrimonio, sino tambien dar limosna sin licencia de su marido, excepto en cuatro casos. x x x El marido no necesita la disolucion del matrimonio para constituirse real y verdedero dueno de todos los gananciales, pues durante este tiene en el 'efecto su dominio irrevocable asi los puede administrar, trocar, y no siendo castrenses ni cuasi castrenses, vender y enegenar a su arbitrio, cesante el doloso animo de defraudar a su mujer como se prueba de la ley."

There is so far as I can learn no authoritative translation of Febrero's treatise. It is clear that the translation used in Penaud v. Jones, is, in some important particulars incorrect, and in others the meanings attributed to Spanish words are not necessary ones. Thus *"que este fallece",* may mean, and according to Escriche, infra, a more reliable authority, should be, not the death of the husband, but the expiration of the marriage community, a very important difference. The adjective, *ficta,* which is translated "feigned" has also the meaning artificial and corresponds fairly to our word nominal. *Dueno,* translated "owner" has also the meaning, master. Judging from the fact that Escriche, in his very comprehensive Dictionary

or Encyclopedia of Law, does not define or even mention it, the word has no established and recognized meaning in Spanish law and was used loosely in the statement under consideration. The word *dominio* is here rendered "dominion" and properly so, I think, but in Guice v. Lawrence the word "ownership" is used as its equivalent. In the brief for the appellee the latter meaning is given to it in a citation from Escriche, with the effect of converting the citation into an authority for the appellee from one against him as it seems really to be. The citation, leaving that word in the original, is as follows: "The husband and wife have the *dominio* of the acquest property with the difference that the husband has it nominally and in fact and the wife only nominally, the fact becoming effective when the marriage is dissolved." Escriche Dic. Raz. de Leg. y Jur., Tom. 2, p. 86: The real meaning of the word *dominio* becomes therefore a matter of, perhaps, decisive importance. If its meaning is not, in that connection, ownership, but dominion, right of control and disposition, then Febrero and the cases founded on his authority do not aid the appellee's contention and Escriche is distinctly against it. That the latter rather than the former is its ordinary meaning the dictionaries inform us. Its meaning as used in law is given in the Cyclopedia of Law and Procedure as, "The right or power to dispose freely of a thing, if the law, the will of the testator, or some agreement does not prevent." That definition is taken from the remarkable case of United State v. Andres Castillero, which occupies almost half of the second volume of Black's Reports. The case is remarkable besides, from the fact as asserted in argument, that "In the bulk of the record and the magnitude of the interests at stake" it was probably "the heaviest case ever heard before a judicial tribunal," from the corresponding eminence of the counsel engaged in it, and the wealth of research and learning lavished upon it, by court and counsel.

Justice Wayne adopted and incorporated entire in his dissenting opinion, the opinion of Judge Ogden Hoffman, the District Judge, from whose judgment the case was appealed "as the best way of expressing my appreciation

of the law and the merits of the case and of his judicial learning and research in connection with it."

Mr. Justice Catron, who with Mr. Justice Grier also dissented, spoke in even higher terms of praise of Judge Hoffman's learning. In Judge Hoffman's opinion as adopted by Judge Wayne, on pages 226-7 of the volume named, occurs the definition referred to and in connection with it a discussion of various Spanish terms employed to describe different interests in real property, quoted from Spanish writers. The opinion shows that "dominio" alone has the meaning already adopted by the Ccylopedia. Other words are added when it is desired to express full and complete ownership, as *"dominio pleno y absoluto"* or *"con el dominio y propiedad"*, meaning "with the right of disposition and property" making the two elements of ownership distinct. While it is true that the opinion of Judge Hoffman did not prevail with the majority of the Supreme Court, there was nothing in the decision of that tribunal to detract from the enconiums on his learning by the dissenting justices, and the definitions he gives are besides cited from Spanish law writers of the highest repute.

It is not claimed that the right of the wife to dominion and possession of half the common property was not revocable and artificial or as we should say, determinable or defeasable and nominal during marriage, nor that the husband was not the real master of the community and its property.

All that might be consistently with her having a proprietary interest in it which other expressions of the Spanish and Spanish-Mexican treatises abundantly indicate that she had.

Thus it is said in Novisimo Sala, Mexicano, section 2 A, titulo 4, that a feature of marriage is "the acquisition for both spouses, by the halves, of that which each may gain during the marriage, so that all the property which the husband and wife may have belonged to both, one half to each *minus* that which either may prove to belong to him separately". Ballinger says pp. 384, 395, quoting from Schmidts Civil Law "the law recognizes a partnership between the husband and wife as to the property acquired

during marriage." "Husband and wife are entitled to an equal share in the community although one of them should at the time of marriage have been without any means. At the same time, both are liable in equal proportions for the losses and debts during its existence." And of like tenor are all the statements I have found from similar sources as to the effect of marriage in making the gains of the parties to it their common property. Indeed the very expression "community property" is a misnomer, if that is not the case, all the learned treatises on it are little better than waste paper, and the celebrated chapter on the natural history of Iceland "Concerning Snakes", might have been substituted for them with great gain in brevity and not much loss in substance. All that the decision of the court leaves of the system might have been expressed in a half dozen lines—that if the wife survives the husband she shall have a certain share of the property of which he dies possessed which they gained during their marriage by onerous title. That it was something substantially more than that is shown by the fact that the wife's half was subject to confiscation without affecting the half of the husband. Ballinger Com. Prop., p. 396; Escriche's Dic. Raz. de Leg. y Jur. pp. 86 et seq. Surely that which is nonexistent, or exists only as a mere expectancy if at all, cannot be reached by a present act of confiscation. Equally significant is the fact that on the decease of the wife half of the community property, subject to the payment of its debts, etc., went to her heirs. If up to the moment of her death her husband was the owner of it, how could it thereupon become a portion of her estate subject to the law of descent? And, finally, that the husband's power of alienation was that of an agent or trustee and not that of an owner, is manifest from the fact that the wife's interest in the proceeds of a sale made by him of community property was the same as in the property itself. In that respect her interest differs fundamentally from a wife's right of dower, which does not attach to the proceeds of the sale of the land in which the inchoate right existed.

The appellee places great reliance on Guice v. Law-

Reade v. de Lea.

rence, 2 La. Ann. 226: Let us examine its title to be considered authority by us. It was decided as far back as 1847, avowedly on the Louisiana Code, in a case in which the right of the husband to convey real estate of the community to pay his separate debts contracted before marriage was involved. The widow claimed that she was entitled to one half of the community property remaining after the payment of the community debts, but the court held that the alienation by the husband was valid for the purposes of that case at least. The right to proceed against the heirs of her husband on the ground that the transfer was made in fraud of her rights was especially reserved to the widow by the court. As to the correctness of the decision itself I make no question, nor do I affirm tha it would not have been correct if it had been based on the Spanish law. But the court went beyond the requirements of the case to declare that the laws of Louisiana have never recognized any title in the wife during marriage to one half of the acquests, which may have been the case, and that the provisions of the code on the subject are "the embodiments of the laws of Spain, without any changes" which is not admitted. The statement of Febrero already referred to is quoted to sustain that proposition. But that, as before stated, is not equivalent to saying that the husband is the owner of the community property. It declares only that he is the "master" of the community as indeed the court elsewhere states, and adds that he "has power to alienate the immovables which compose it by an encumbered title without the consent or permission of the wife."

As Ballinger points out (Sec. 6) the Louisiana law on the subject is a hybrid. Louisiana became a French colony in 1700 with imported French laws. It was transferred by France to Spain in 1763, which led to more or less modification of the existing laws. It was returned to France in 1800 and the Code Napoleon became the law of the land, but it could hardly have taken deep root since the Territory was ceded to the United States in 1803. In 1806-8 a code was adopted which was revised in 1822-4 and to it presumably reference is made by the court in

Guice v. Lawrence, supra. It should be born in mind in this connection that it was not the Spanish law, as it was when Louisiana was a Spanish province, or before, which came with New Mexico, but that law as modified in Mexico, after her independence and very likely before, to some extent. That was the law of California as well as of New Mexico, but in that state it has been changed by statute in essential particulars. The early California cases are so conflicting as to practically neutralize each other. In Panaud v. Jónes, supra, as has been said, the doctrine of Guice v. Lawrence was adopted. But in Beard v. Knox, 5 Cal. 252, the court said, "the wife's interest in the common property is a present, definite and certain interest". In Van Maren v. Johnson, the court, through Judge Field, made the declaration which this court now adopts, that the interest of the wife was during marriage "a mere expectancy similar to that of an heir in the estate of his ancestor," citing Guice v. Lawrence, supra, as authority for that proposition. That statement was in the nature of a dictum as the question was whether the common property was liable for the debt of the wife contracted before marriage, and it was held in the affirmative. Not many years later it was said in Gody v. Gody, 39 Cal. 157, that although we had perhaps no better word than "expectancy for the wife's interest, yet her right is as well defined in contemplation of law even during marriage as that of her husband." "Later radical changes were made in the statute law of the state and they should be taken into account in considering cases subsequent to them such as Spreckles v. Spreckles, 116 Cal. 339, on which the appellee lays so much stress. Of the California statutes Ballinger says (Sec. 77.) "The interest of the wife does not ripen into a legal right even upon her death, in California, for want of a statute making her estate entitled to it" and it was so held in Packard v. Aurellanes, 17 Cal. 539, on the ground that the California statute on the subject merely designated the persons to whom half of the community property should go on the death of the wife, but did not make it a part of her estate. By statute, in 1861, it was distinctly provided that upon the dissolution of the com-

munity by the death of the wife, the entire community property should go to the husband, and it has since been added that it "shall go" to him "without administration," "except such portion thereof as may have been set apart to her by judicial decree for her support and maintenance." By those provisions the wife's interest was indeed "a mere expectancy" depending on her surviving her husband, and the decision in Spreckles v. Spreckles, supra, although not in terms based on the statute, was quite in keeping with it. As Beatty, C. J. said at the close of his opinion, concurring in the result, "if the husband survives the wife, he will get everything he had not voluntarily parted with." But no such conditions have ever obtained here, and why should we import conclusions when the premises are lacking? Says Ballinger, (Sec. 6) "The Territory of New Mexico seems to have borrowed the Spanish law of property rights of married persons in its entirety and with slight modifications." He adds: "The present, condition of the laws of New Mexico and the difficulty of access thereto prevents an accurate statement of their provisions." This court fortunately is not under that disability, and can easily resort to this uncorrupted source of information.

Section 2030, C. L. 1897,the existing statute law of the Territory, provides that "one half of the acquest property which remains after the payment of the common debts of the marriage, shall be set apart to the surviving husband or wife absolutely." By Section 2031, it is provided that after the payment of the common debts, the deduction of the survivor's separate property, and his or her one half of the acquest property, and subject to the payment of the debts of the decedent, "the remainder of the acquest property and the separate estate of the decedent shall constitute the *body of the estate* for descent and distribution, and may be disposed of by will or in the absence of a will shall descend as follows: one-fourth thereof to the surviving husband or wife, and the remainder in equal shares to the children of the decedent."

The power which the wife has under this statute to dispose of her share of the community property by will to

take effect during the life of her husband makes her owner-
ship distinct and certain. The statute even makes her hus-
band one of the distributees assuming to give him, if the
view of the appellee is sound, what he already owns. It
provides also that her share shall go to her children even
though they are not his. No distinction is made between
what remains of her separate estate, after deductions,
and what remains of her half of the community prop-
erty, but they are united to make up the *"body of the
estate."*

It is significant that this has been the statute law
of the Territory, in essentials, from the beginning, in
1851. It was probably in the main an adoption of the
Spanish-Mexican law, but it was made by those who had
lived under that law and knew what it was at the time.
From that time, whatever its origin, it became the law of
New Mexico to be interpreted by this court in accordance
with the fair intent of its own terms and not to meet the
views of other courts growing out of departures from the
standard to which New Mexico has adhered. It gave the
wife an interest widely different from "that of an heir
in the estate of his ancestor." Until the interest of an
heir in the estate of an ancestor who survives him will pass
by his, the heir's will or descent to his heirs, the similar-
ity declared in Van Maren v. Johnson, supra, lacks much of
complete likeness. Rather is her interest like that of a
minor under guardianship, whose ownership is complete
although his property is subject to control and alienation,
as the law provides, but who has, in general, no power in
himself either to manage or sell it, and will never have
such power unless he happens to live to the age at which
the law admits him to that right.

The statute in question is not the first assertion by
the Territorial Assembly of its right to limit the power
of the husband to alienate the community property. As far
back as 1887 by chapter 37 of the Session Laws of that
year, it was provided that the "wife and family" of a mort-
gagor should not lose their right to homestead through a
mortgage in which she had not joined. Until now the
validity of that law has not been questioned, in this court

at least.  If the wife is the present owner of a like equal interest with the husband in the community property although it is determinable by the exercise of his undoubted although not absolute right of sale, that fact goes far towards proving that the power which the law confers upon him by force of the marriage itself, is that of an agent, manager or trustee only.

The recent case of Garrozi v. Dastas, 204 U. S. 64, is cited for the opposite view, but I am unable to perceive how it affords it any support.  Says the court, through Mr. Justice White, "the very foundation of the community and its efficacious existence depend on the power of the husband in the absence of fraud, or express legislative restriction, to deal with the community and its assets as its owner  x  x  x  and not to render the community inert and valueless to both parties by weakening the marital power of the husband as to his expenditures and contracts so as to cause him to be a mere limited and consequently inefficient agent."

No question is made that the husband, with the exceptions above stated has the same power to deal with the community property that he would have if he were "the owner" of the whole instead of being as to one half the "agent" or trustee of the owner.  That the meaning of the court was not what is claimed for it is put beyond quetsion, as it seems to me, in the opinion by the same justice, himself, as the majority opinion suggests, presumably learned in the civil law, in Warburton v. White, 176 U. S. 484, sustaining the decision of the Supreme Court of Washington and commenting with full approval on Holyoke v. Jackson, 3 Wash. Ter. 235; Hill v. Young, 7 Wash. St. 33, and Mabie v. Whittaker, 10 Wash. St. 656, the three cases in which the Washington doctrine is fully and ably set forth.  As this case is, to my mind, conclusive of the question, for this court, I quote from the opinion at length, including here instead of stating them apart, the extracts from the Washington cases referred to, which the learned justice stamped with his approval in the course of his opinion: "The nature of common or community property, within the Territory of Washington, as such property was

constituted by the act of 1873, and the operation of the act of 1879 upon property of that character acquired prior to the passage of the latter act was considered in 1882 in the case of Holyoke v. Jackson, 3 Wash. Ter. 235. The question for decision in that case was whether, while the act of 1879, was in force, a husband could, without his wife joining, make a valid contract to sell community property acquired prior to 1879. In deciding this question in the negative the court, in the course of the opinion, said (p. 238) 'By the provisions of the husband and wife acts passed in 1879, and previously, the husband and wife were conceived as constituting together a compound creature of the statute called a community. * * * In it the proprietary interest of husband and wife are equal, and those interests do not seem to be united merely but unified; not mixed or blent, but identified. It is *sui generis* - - - a creature of the statute. By virtue of the statute this husband and wife creature acquires property. That property must be procurable, manageable, convertible and transferable in some way. In somebody must be vested a power in behalf of the community to deal with and dispose of it. x x x Management and disposition may be vested in either one or both of the members. If in one, then that one is not thereby made the holder of larger proprietary rights than the other, but is clothed, in addition to his or her proprietary rights, with a bare power in trust for the community. This power the statute of 1873 chose to lay upon the husband, while the statute of 1879 thought proper to take it from the husband and lay it upon the husband and wife together. As the husband's "like absolute power of disposition as of his own separate estate," bestowed by the ninth section of the act of 1873, was a mere power conferred upon him as a member and head of the community in trust for the community, and not a proprietary right, it was perfectly competent for the legislature of 1879 to take it from him and assign it to himself and his wife conjointly. This was done.'

"In Hill v. Young, 7 Wash. St. 33, it was decided that the husband's power to dispose of the common property was not a vested right which would not be taken away by

subsequent statute. In the subsequent case of Mabie v. Whit-taker, 10 Wash. St. 656, the provisions of the law of 1869 were again considered. Land had been purchased on Aug-ust 10, 1871, by one Mabie, with community funds, dur-ing the existence of the act of 1869. While Mabie held the legal title, the legislature repealed the act of 1869, and on November 29, 1871, an act was approved which, in sec-tion 12, provided that the husband should have the man-agement of all the common property, but should not have the right to sell or incumber real estate without the joinder of his wife. x x x The court, however, said: 'But, leav-ing out of consideration all question as to whether he could only exercise such right while his wife was living, and could not convey the entire title, under the former law, after her death, and cut off her heirs, we think the sub-sequent act took away his power to do so. It was imma-terial whether the record title of the community lands stood in the name of the husband or of the wife, or both of them, when considered with reference to the power of the legislature to authorize either or both of them to convey. The legislature could as well have pro-vided that the wife could convey, as the husband; and if it had power to say that either could dispose of the com-munity interest of the other, it could say that neither could do so. Changing the manner of the conveyance did not alter the status of ownership. It could not make the interest of either spouse in community lands greater or less.' x x x

"The statute of 1871 did not undertake to divest any right which had become vested. Mabie, receiving this conveyance under the act of 1869, thereby became the own-er of an undivided one half interest in the land, and his wife thereby became the owner of the other half. x x x Her right was as much a vested right as his."

Following the quotations from the Supreme Court of Washington of which the foregoing are excerpts, the opinion proceeds as follows:

"The rule announced in the foregoing cases was reit-erated in the opinion delivered in the case at bar, it being held that Bacon did not become the sole owner of the prop-

erty in question by the purchase in 1877, but that it became and continued community property so long as the community existed, and that the descent of such property was subject to regulation at will by the legislature."

"Now, it cannot in reason be denied that the decisions from which we have just quoted held that the purpose of the legislature of Washington, whether territorial or state, in the creation of community property, was to adopt the features essentially inhering in what is denominated the community system—that is, that property acquired during marriage with community funds became an acquet of the community and not the sole property of the one in whose name the property was bought although by the law existing at the time the husband was given the management, control and power of sale of such property, this right being vested in him, not because he was the exclusive owner, but because by law he was created the agent of the community, the proceeds of the property when sold by him becoming an acquet of the community, subject to the trust which the statute imposed upon the husband, from the very nature of the property relation engendered by the provision for the community."   x   x   x

"Obviously, the reasoning of the plaintiff in error, upon which the assumption that community property bought during the existence of the act of 1873 was solely the property of the husband, involves not only a contradiction in terms but invokes at the hands of this court, in order to overthrow the rule of property in the State of Washington, an interpretation of the statutes of that state which is not only confusing, but self-destructive. It cannot be doubted, under the text of the act of 1873, that the property relations of husband and wife were controlled by what is denominated the community system and that in consonance therewith the statute referred to treated property acquired during marriage with community money as community or common property. Although this is patent, the argument is that the provision in the statute giving the administration and disposition of the community property, to the husband operated to destroy the community system and render it impossible, under the statute, for community or

common property to exist. In other words, the interpretation relied upon asked us to say that because of a provision which simply pointed out how common property should be administered, it resulted that there was no common property to be administered. This would be but to declare that the statute brought about a result which was contrary to its express language, providing for the existence of the community system. It is a misconception of that system to suppose that because power was vested in the husband to dispose of property acquired by the community during marriage, as if it were his own, therefore by law the community property belonged solely to the husband. The conferring on the husband the legal agency to administer and dispose of the property involved no negation of the community, since the common ownership would attach to the result of the sale of the property."

How this court's view of the nature of the rights of husband and wife in the community property, as stated in the majority opinion, is to be reconciled with what Mr. Justice White, speaking for a unanimous court here says, I am unable to perceive. When it is said by way of attempted distinction that Warburton v. White rests on a statute of Washington, it should be added that the statute provided that the husband should have the entire management and control of the common property "with the like absolute power of disposition as of his own separate estate", quite as clear and explicit a statement of his *dominio* as the Spanish law furnishes.

The general principle on which such legislation as that in question is based is well stated in Baker Executors v. Kilgore, 145 U. S. 487-490. "Moreover his (the husband's) right prior to that enactment did not come from contract ·between himself and his wife, or between him and the state, but from a rule of law established by the legislature and resting alone upon public considerations arising out of the marriage relation" x x x "The relation of husband and wife is therefore formed subject to the power of the state to control and regulate both that relation and the rights directly connected with it by such legislation."

That it is a wise and beneficient measure of public policy which confers on the wife the power to protect herself and her children, to some extent against the improvidence, caprice or purposely harmful conduct of the husband, by withholding her assent to the alienation of their homestead, or other real estate, few would question. It is the established policy of nearly, or quite all the states of the Union.

The decision of the court renders ineffective Chapter 62, Sec. 5 of the Acts of 1901, and by necessary inference Chapter 37, Sec. 16, of the Acts of 1907, which in part supersedes it but which makes the assent of the wife essential to a valid conveyance of the homestead, so far as either may relate to real estate acquired before its enactment. This is a result greatly to be deprecated and one which we all, doubtless, agree should not be brought about by this court, unless it is constrained thereto in obedience to plain principles of law. Certainly no law of the Territory, or decision of the Supreme Court of the United States, or previous decision of this court, constrains us to that course. To say the least the decisions of the other courts to which the judgment of this court is now made to conform, are in my opinion, open to such serious doubt that they should not be followed to reverse the express will of the legislative branch of the government.